DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, John Edward Liddle, appeals from his judgment of conviction in the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On January 21, 2005, appellant was indicted by the Summit County Grand Jury on two counts of the rape of a child under the age of thirteen by use of force, in violation of R.C. 2907.02(A)(1)(b), a first degree felony; and two counts of gross sexual imposition of a child, in violation of R.C. 2907.05(A)(4), a third degree felony. Appellant pled not guilty to all counts and the matter proceeded to trial before a jury. *Page 2 
 {¶ 3} At the completion of all the evidence, the jury returned a verdict of guilty on all counts. The trial judge sentenced appellant to life in prison on each count of rape, to be served concurrently with each other, and five years imprisonment on each count of gross sexual imposition to be served concurrently with each other and consecutively to the life terms. In addition, the court found that appellant is a sexual predator who is likely to reoffend.
 {¶ 4} Appellant filed a timely notice of appeal and assigns two errors for review. The second assignment of error will be considered first.
 II. ASSIGNMENT OF ERROR II "THE PROSECUTION FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SUPPORT THE ELEMENTS OF RAPE AND GROSS SEXUAL IMPOSITION AND THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 5} Appellant argues that the state produced insufficient evidence to support the verdicts and that the verdicts are also against the manifest weight of the evidence. Specifically, he contends that the record contains no evidence of penetration, as is required for proof of the crime of rape, and he further contends that R.B., the prosecuting witness, was not a credible witness. This Court finds the assignment of error to be without merit.
 {¶ 6} A review of the sufficiency of the evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for *Page 3 
sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook J., concurring). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution. See State v.Jenks (1991), 61 Ohio St.3d 259, 279.
 {¶ 7} When reviewing the weight of the evidence, "[t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations sic). Tewarson v.Simon (2001), 141 Ohio App.3d 103, 115, citing Thompkins,78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 8} R.C. 2907.02(A)(1)(b), proscribing rape, provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age[.]" R.C. 2907.02(A)(2) prohibits such sexual conduct when it occurs "by force or threat of force." Sexual conduct includes the insertion, without privilege to do so, of any part of the body into the vaginal opening of another. R.C. 2907.01(A) "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." Id. *Page 4 
 {¶ 9} R.C. 2907.05(A)(4), proscribing gross sexual imposition, provides: "No person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * ** is less than thirteen years of age[.]" R.C. 2907.05(A)(1) prohibits such sexual contact when it occurs "by force or threat of force." "`Sexual contact' means any touching of an erogenous zone of another, including * * * the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).
 {¶ 10} The evidence presented at trial established the following. The victim, R.B., born May 8, 1991, has two older sisters, B.B. and A.B. At the time of trial, the girls were 14, 19, and 21, respectively. The girls' parents, Larry Beese ("Father") and Tara Grady Beese ("Mother"), had been married, but separated shortly after the birth of R.B, in 1991. They obtained a divorce in 1994. Mother had custody of all three girls until 2004, when Father obtained custody in a separate court action. Father remarried with one Ginger Beese ("Stepmother") and they resided in Geneva, Ohio.
 {¶ 11} Appellant, Liddle, came to Ohio when he obtained a job with the Ohio Department of Transportation, after a brief career in the military. He had previously been married, but his wife died suddenly of a heart aneurism in December 1990. On coming to Ohio, Liddle moved in with his brother, and, in *Page 5 
early 1994, joined a church where he became acquainted with the victim's family. Liddle's relationship with the family continued for the next five or six years.
 {¶ 12} In the summer of 1994, the church pastor asked Liddle to help Mother and her daughters move into an apartment that was right around the corner from the home of Alda McClure, maternal grandmother ("Grandmother"). After Liddle helped them with the move, Mother began calling Liddle and asking him for help with various home maintenance items and with care of the children. Liddle helped the family by doing household chores and by taking the children to sporting events, helping them with homework, buying them things, and babysitting. He began attending their family gatherings for movies, birthdays, and holidays. In 1999, Liddle needed a place of his own because his brother was moving. Grandmother offered to let him stay in her basement. Liddle moved into her basement and continued to see R.B.'s family frequently when they came to Grandmother's home and when he helped Mother at her home.
 {¶ 13} In 2000, R.B. told her Mother and Grandmother about her experience with Liddle, though the record does not indicate exactly what she told Mother at that time. Liddle was told to leave Grandmother's house, and R.B. had no further contact with him. There is no indication that Mother made a police report. *Page 6 
 {¶ 14} Father had not been very involved in the lives of his daughters until 2001.[1] At that time, he began having regular visits with R.B. and her sisters. It was not until August 2004, when Father was seeking custody of R.B, that the child confided in Stepmother that Liddle had abused her for years. Stepmother told Father, and he spoke to Mother, who was apparently aware of the allegations, but was very nonchalant about it, believing that it was "taken care of long ago "through the church." When Father did obtain temporary custody on October 29, 2004.[2] Father immediately initiated counseling for R.B. and that led to the making of a police report[3] and contact with children services. Further referrals led to appointments at the Tri-County Child Advocacy Center of Children's Hospital in Ashtabula, where R.B. met with medical social worker, Dianne Russo, and pediatric physician, Dr. Jason Kovalcik. R.B. also began counseling with Jeannette Behm.
 {¶ 15} At trial, R.B., age 14, testified regarding the events involved in these charges. She stated that she first met Liddle when she was two or three years old. She saw Liddle frequently from 1994 to 2000, and almost daily during the last *Page 7 
year when he lived in Grandmother's basement. He spent time with her and did things for her and the other members of the family. He helped Mother with home maintenance, took R.B. and her sisters to sports events, bought R.B. presents, and baby-sat her. In doing these things, she said that Liddle gained her trust. She said that her relationship with Liddle was like a little girl with her dad. When she was young, she believed Liddle might marry her mother. When she was very young, Liddle would give her kisses, hugs, run his hand through her hair, and let her sit on his lap a lot to watch television or videos.
 {¶ 16} By the age of four, R.B. said that Liddle would touch her bare skin on her private parts — "my chest, my butt, and my vaginal area" — and did so several times over the course of the next few years. He kissed her on her lips and neck, and asked her to do the same to him. He reached under her clothing to touch her bare skin. He would casually scratch her back and his hand would move down, or he would rub her stomach and reach up to her chest. If someone came down the stairs into the basement, he would remove his hands from under her clothing. R.B. also said Liddle made her touch his penis over his clothing, and touch his "butt" under his clothing. She stated that he often wore women's clothing when he touched her.
 {¶ 17} R.B. explained that Mother would scratch her back and rub her stomach on occasion, and she had had little contact with Father; so she did not question Liddle's behavior for a long time. Later, she realized that his kisses were *Page 8 
more like a boyfriend's than a relative's; they were more intimate. She also noticed that his kisses lasted longer when they were alone, than when they were in public or with family members. He told her he loved her and would always be there for her.
 {¶ 18} Upon direct questioning, R.B. specifically testified that Liddle inserted a portion of his finger into her vagina on two occasions. She claims he urged her to not tell anyone. R.B. explained that Liddle was a parental figure and she had continued to trust him. He was older, bigger, and stronger than she.
 {¶ 19} R.B. also testified that Liddle played the game of cops and robbers with her. His bed was the "jail." After he caught her, he would use handcuffs or metal bars with leather straps at the ends, meant to restrain her arms or hold her legs apart. R.B. said she complained to him that one of the devices hurt her and he did not use it again. She would sit on the bed with a bar between her legs and Liddle would sit closely behind her. At some times she said she felt helpless and scared.
 {¶ 20} Medical social worker, Dianne Russo, had specialized training in the prevention and detection of child abuse and sexual abuse. She testified regarding her interviews of Father and Stepmother, who initially reported the allegations, and her videotaped interview of R.B., conducted on November 24, 2004. Russo testified that R.B. was very bright and cooperative. Except for the fact that, in her interview, R.B. said that Liddle only "tried" to digitally penetrate her, Russo's *Page 9 
report of the interview was essentially consistent with R.B.'s testimony in court. Russo's final impression was that the child had been a victim of sexual abuse.
 {¶ 21} Jeannette Behm, a licensed clinical counselor with 35 years of experience, was R.B.'s counselor since August 2005. She testified that R.B. was embarrassed to discuss the digital penetration initially, but eventually admitted to two occasions of digital penetration by Liddle. Behm explained that young children are extremely trusting. Liddle's urging of R.B. to keep the digital penetration secret was a form of coercion.
 {¶ 22} She further explained that Liddle used a type of "grooming" of his victim, i.e., setting up the victim and even her family into trusting him so as to become more available and more easily controlled by him. He would become the most important person in her life so she would do anything for him. He gave her special favors and gifts. He was always there for her. According to the counselor, because R.B. received most of her nurturing from Liddle over a long period of time; his behavior with her became a normalized experience for her.
 {¶ 23} Det. Richard Armsey, of the Summit County Sheriffs Dept, who had special training in the detection and prevention of child abuse and sexual abuse and worked exclusively with crimes against children, was assigned to the case on December 5, 2004, after Father filed a police report. He investigated the case by contacting the Ashtabula children services agency, and also by interviewing Grandmother, Mother, Father, Stepmother, both sisters. and R.B. *Page 10 
 {¶ 24} Det. Armsey interviewed Liddle on January 7, 2005. At that time, Armsey stated that Liddle explained that he had been "starving for affection" after his wife died, and "basically * * * admitted" to the crimes charged, including inappropriate touching and two instances of digital penetration. Armsey learned of B.B.'s involvement and that led him to believe that Liddle had a preference for young girls. He testified that Liddle's behavior was the normal grooming behavior that a pedophile would use. Armsey prepared a written report to that effect and also so testified. Liddle did make a brief written statement while at the police station, but the statement refers only to meeting the family and helping them. It was disputed as to whether Liddle was actually finished with the statement, and defense counsel questioned the lack of a taped interview, but Armsey testified that it is not protocol to tape initial interviews.
 {¶ 25} The oldest child, A.B., testified and confirmed R.B.'s testimony that Liddle took the three girls on outings, bought them gifts, played with them, and saw them almost daily. She testified that she did not become as close with Liddle as her sisters. He made her uncomfortable and she stopped his advances abruptly. She said Liddle had the girls sit on his lap to drive his car, and she saw him run his hands through his sisters' hair and rub their backs. He saw Liddle kiss both sisters, and saw that his kisses with R.B. were lingering, and not just a peck. In August 2000, she recalls seeing Liddle giving R.B. a backrub and then a long kiss, which upset her. She privately told Liddle that his behavior was not appropriate *Page 11 
and also told Mother about his behavior, who reportedly said and did nothing about it.
 {¶ 26} B.B., the middle child, testified similarly and in further corroboration of R.B.'s testimony. She testified that Liddle had all the Disney movies on tape and would let the girls sit on his lap to watch them. He would rub their backs underneath their shirts, and kiss them for longer than she now realizes he should have. Liddle allowed B.B. to use his telephone to secretly call a boyfriend of whom her family did not approve. She claimed that when she was twelve-years-old, Liddle told her he would like a relationship with her and perhaps marry her. B.B. testified that she witnessed Liddle kiss and hug R.B. in an inappropriate way. She once witnessed restraints on R.B. At that time, she insisted that Liddle take the device off R.B immediately and took her home. She told Mother what she knew and told R.B. to tell her the rest.
 {¶ 27} For his part, Liddle, age 46, denied behaving inappropriately with the girls. He admitted kissing and hugging them, but denied doing so inappropriately or otherwise touching them improperly. Furthermore, he denied telling Det. Armsey that he did. Liddle admitted owning handcuffs, but denied owning any "sex toys" or telling R.B. not to tell anyone anything. Liddle stated that Mother often asked him to do things for her and the family, including babysitting the children. She invited him to their home to watch movies and for family gatherings, such as holidays and birthdays. He would usually see the girls three to *Page 12 
four times per week, and sometimes five to six times per week. According to Liddle, they considered him a part of the family. Liddle also testified that he once was interested in the possibility of having a relationship with Mother.
 {¶ 28} Liddle stated that in August 2000, the church pastor asked him to leave Grandmother's home, claiming Grandmother no longer wanted him to live there — but that no reason was given to him.[4] Liddle testified that he believed Mother took advantage of him and placed him in an inappropriate position by asking him to baby-sit the girls so often. He stated that he was actually relieved to be moving because he would no longer be bound by the relationship with Mother that had become manipulative and demanding. He had concluded that there was no longer a chance for a relationship with Mother. He also testified that he was presently married.
 {¶ 29} In his sufficiency argument, Liddle contends that the only evidence of the penetration necessary for proof of rape came by way of leading questions to which defense objections were sustained. He asserts that the record, therefore, contains no admitted testimony of penetration and that the rape convictions should be vacated. *Page 13 
 {¶ 30} Our review of the portions of the transcript to which Liddle has pointed discloses that the prosecutor did utilize some leading questions in her examination of the victim. Notwithstanding Liddle's argument, Evid.R. 611(C) permits the use of leading questions where necessary to develop testimony, subject to the sound discretion of the trial court. State v. Lewis (1982), 4 Ohio App.3d 275, 277-278. Furthermore, Ohio case law has explained that the trial court is to be given latitude in such matters, especially in cases involving children who are the alleged victims of sexual offenses. See State v.DeBlasis, 8th Dist. No. 81126, 2004-Ohio-2843, at ¶ 44. See, also,State v. Holt (1969), 17 Ohio St.2d 81, 83. This Court has recognized that the necessity to use leading questions to develop testimony may be more critical where the witness is a child who may be uncomfortable, fearful or perplexed by the legal system. State v. Foster (May 23, 1990), 9th Dist. No. 14277. Leading questions are often permitted in order to pinpoint specific details and times. State v. Rodrigues (Mar. 26, 1996), 10th Dist. No. 95APA06-683, citing State v. Madden (1984), 15 Ohio App.3d 130,133. Such testimony may not be a ground for reversal on review unless prejudice results. Foster, supra. See, also State v.Butler (Jan. 29, 1997), 9th Dist. No. 96CA006343, and the cases cited therein.
 {¶ 31} The trial court did exclude some matters from the consideration of the jury upon objection to leading questions. However, the testimony which Liddle claims was excluded, the portion of R.B.'s testimony where she stated that *Page 14 
Liddle digitally penetrated her vagina, was not excluded from evidence. That evidence was admitted without objection. Consequently, Liddle's argument that there was no evidence before the trial court on this point is without merit. Moreover, we find no abuse of discretion by the trial court in the manner in which it handled the leading questions addressed to this witness.
 {¶ 32} Next, Liddle contends that R.B. was not a credible witness because, during her testimony, she admitted to having lied on several occasions. Liddle contends that his convictions are against the manifest weight of the evidence on that account. He focuses on two assertions: 1) a claim that R.B told Mother; medical social worker, Dianne Russo; and pediatric physician, Dr. Jason Kovalcik, that Liddle did not insert anything into her vagina; and 2) a claim that she lied about being angry with her Father and Stepmother and that she made false accusations about them.
 {¶ 33} First, we consider the allegation that R.B. told several people that Liddle did not digitally penetrate her vagina. Such statements must be placed in context. In her testimony, R.B. admitted that she had denied digital penetration in response to a question by Mother in 2000. The record also contains testimony by all three girls that Mother was controlling and had urged them not to say anything negative about her or her care of them. R.B. said she avoided talking to Mother about the abuse, and that Mother actually pressured her not to talk about it. The evidence also reflects that previous reports to Mother about the abuse resulted in *Page 15 
no action by her. In addition, the girls were young, dependent on Mother and, according to the oldest sister, A.B., the girls did not want to be taken out of their home and believed they needed to protect their mother.
 {¶ 34} R.B. also admitted that she had told medical social worker Dianne Russo that Liddle tried to put his finger in her vagina, but that it did not go inside. When asked about the apparent contradiction on cross-examination, R.B. explained that she meant only part of his finger went inside. She also said she was embarrassed and not comfortable talking about this during the taped interview with Russo. The question was asked near the end of the interview and she was anxious to be done with the questioning.
 {¶ 35} In her testimony, Russo explained that many people in such situations underreport their experience, perhaps due to shame, embarrassment, or as a coping mechanism. Also, children who experience repeated abuse may not provide complete accounts because they often blend and mix the experiences from multiple occasions. Furthermore, children frequently do not understand their bodies or such terminology sufficiently to explain what has happened to them. She further explained that children sometimes recant because of outside pressure or a desire that people not get into trouble.
 {¶ 36} Counselor Behm stated that, after R.B. overcame her initial embarrassment, she admitted that digital penetration had taken place. Behm testified, similarly to Russo, that children often do not understand the meaning of *Page 16 
penetration and may think it requires the entire finger or they may simply get tired of questioning. It is not uncommon for children to provide inconsistent statements. Children, she stated, have limited attention spans and may have different rapports with different interviewers. As part of her work with R.B., Behm diagnosed the child as having major recurrent depression and post-traumatic stress disorder, marked by intense feelings of helplessness and recurrent and obtrusive flashbacks of the traumatic events. Behm found that R.B.'s behavioral indicators were consistent with sexual abuse and expressed the opinion that she had been a victim of sexual abuse.
 {¶ 37} As to Dr. Kovalcik, his testimony regarding a lack of penetration was merely a report of Russo's interview with R.B. Kovalcik did not independently interview R.B., and his testimony does not reflect that R.B. made such a denial to him.
 {¶ 38} In further support of his position, Liddle also points to the fact that there was no physical evidence of rape. Dr. Jason Kovalcik explained, however, that a lack of physical evidence is not inconsistent with vaginal penetration and, in any event, there was not likely to be any evidence of penetration six years after the fact.
 {¶ 39} Second, Liddle points to the fact that R.B. changed her position in regard to Father and Stepmother. Shortly after she was placed in the custody of Father, R.B. made accusations against Stepmother and also claimed she injured *Page 17 
herself because she was angry with Father, both of which claims she later disavowed. At trial, R.B. explained that she was initially upset with being removed from her home and placed with Father. But, she stated that she placed this blame on Stepmother and Father because of pressure from Mother and that the claims were not true. There was, in fact, substantial evidence before the court, which, if credited by the jury would establish that Mother was very controlling and manipulative, and used her position with R.B. to encourage her to be critical of Father and Stepmother.
 {¶ 40} The determination of the credibility of witnesses and the weight to be afforded their testimony is primarily for the trier of fact. State v. Tyler (1990), 50 Ohio St.3d 24, 32. All of the prosecution witnesses were subject to cross-examination and the normal tests of credibility. Liddle took the stand to testify on his own behalf and denied the accusations lodged against him. The jury was free to credit all or a part of each witness's testimony. Upon consideration, we cannot conclude that the verdict demonstrates that the jury clearly lost its way in concluding that Liddle was guilty of the charges against him.
 {¶ 41} Liddle's second assignment of error is without merit.
 ASSIGNMENT OF ERROR I "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND PLAIN ERROR BY ALLOWING TESTIMONY OF SIMILAR ACTS, IN VIOLATION OF RULES OF EVIDENCE 403, 404(B) AND BY ALLOWING TESTIMONY OF DEFENDANT'S SEXUAL REPUTATION AND SIMILAR ACTS IN VIOLATION OF OHIO REVISED CODE §§ 2907.02(D), [and] *Page 18 
2907.05(D). THE TRIAL COURT ALSO FAILED TO DETERMINE ADMISSIBILITY OF ALL SIMILAR ACT TESTIMONY THREE DAYS PRIOR TO TRIAL, AS REQUIRED BY OHIO REVISED CODE §§ 2907.02(E), [and] 2907.05(E), AND FAILED TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL."
 {¶ 42} In this assignment of error, Liddle asserts that the trial court erred in permitting unduly prejudicial testimony regarding his sexual reputation, the family's opinion of his sexuality, and similar sexual acts that did not prove the elements of the instant charges. Specifically, Liddle has challenged the admission of evidence of similar behavior with R.B.'s sisters, discussions of adult sexual behavior with all the girls, examples of cross-dressing, and sadomasochistic behavior. Liddle also argues that the admissibility of similar act testimony should have been determined three days prior to trial and not during trial. See R.C. 2907.02(E) and 2907.05(E).
 {¶ 43} At trial, the older sisters testified that Liddle rubbed their backs; kissed them, sometimes longer than he should have; and ran his fingers through their hair. The middle sister, B.B., testified that Liddle expressed his love to her, at the age of 12, and his interest in marrying her. The sisters both testified that Liddle told them of his previous sexual encounters and his brother's sexual experiences with his wife. He was said to have asked them "weird" questions. Both sisters testified that Liddle's behavior made them feel uncomfortable. They eventually realized the inappropriateness of Liddle's behavior, rejected his advances, and Liddle stopped such behavior with them. *Page 19 
 {¶ 44} Consistent with R.B.'s testimony regarding the use of sadomasochistic devices in games of "cops and robbers," B.B. claimed that she saw Liddle's box of handcuffs, chains, leather things and a whip, and that Liddle told her he had handcuffed his wife to a bed. B.B. also testified about an occasion when Liddle took her to the church basement to roller blade, and Liddle asked her to handcuff him to a pole.
 {¶ 45} Additionally, consistent with R.B.'s testimony that Liddle often wore women's clothing when he touched her, B.B. testified that Liddle possessed, purchased and wore women's clothing. He borrowed clothing catalogs from her and showed her his purchases. A.B. testified that Liddle told her about going to great lengths to dress, talk, and walk like a woman for a holiday party.
 {¶ 46} A trial court possesses broad discretion with respect to the admission of evidence, and an appellate court will not overturn the decision of a trial court regarding the admission or exclusion of evidence absent a clear abuse that has materially prejudiced the defendant. See State v. Hymore (1967), 9 Ohio St.2d 122, 128. An abuse of discretion is more than an error of law or judgment, but instead implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id. *Page 20 
 {¶ 47} Generally, evidence of other criminal or bad acts, wholly independent of the criminal offense for which the accused is being tried, is inadmissible. State v. Thompson (1981), 66 Ohio St.2d 496,497. However, Evid.R. 404(B) provides that while:
 "[evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith[,] [i]t may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added.)
 {¶ 48} R.C. 2945.59 similarly provides:
 "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." (Emphasis added.)
 {¶ 49} Because R.C. 2945.59 and Evid. R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, the standard for determining admissibility of such evidence is strict, and the statute section and rule must be construed against admissibility.State v. Broom (1988), 40 Ohio St.3d 277, at paragraph one of the syllabus.
 {¶ 50} Therefore, in order for "other acts" evidence to be admissible, it must come within one of the theories of admissibility enumerated in Evid.R. 404(B) or R.C. 2945.59. State v. Broom, 40 Ohio St.3d 277,282-283. In addition, *Page 21 
proof of one of these purposes must go to an issue which is material in proving the defendant's guilt for the crime at issue. State v.DePina (1984), 21 Ohio App.3d 91, 92, citing State v. Burson (1974),38 Ohio St.2d 157, 158.
 {¶ 51} The state's theory of this case was that Liddle "groomed" young females over whom he had control. The three girls all became dependent upon Liddle for much of their care, especially the youngest, R.B. He ingratiated himself to them and gained their trust by doing favors, bringing them gifts, and taking them to sports events. They considered him a father-figure. In the process, Liddle used sadomasochistic devices and dressed in women's clothing. The older two girls eventually realized the inappropriateness of Liddle's behavior and stopped it, but R.B. was younger.
 {¶ 52} In State v. Ristich, 9th Dist. No. 21701, 2004-Ohio-3086, a rape case, this Court considered the admissibility of testimony of a person that the defendant had raped fifteen years earlier. Both victims were children at the time of the rapes, and the accused was related to the victims by marriage. He was married to their grandmother and both victims considered the assailant to be their grandfather. The first victim clearly identified the defendant as the person who committed the acts against her, and she described his actions as being very similar to those in the case then before the court.
 {¶ 53} In both cases, the victims knew the assailant and had been led to trust him. The children were between the ages of three and ten when they were *Page 22 
raped. The defendant lavished them with gifts and took them places. He told his victims that each of them was his favorite grandchild. When he bathed them, he anally or vaginally penetrated them, while telling them that that was a way to express their love to each other. This Court found that the prior acts proved a modus operandi, applicable to the defendant in Ristich.
 {¶ 54} This Court noted that evidence of other acts is admissible where it establishes a modus operandi, a "`unique, identifiable plan of criminal activity[,] ` that is applicable to the crime with which defendant is charged." Ristich, 2004-Ohio-3086, at ¶ 15, quotingState v. Lowe (1994), 69 Ohio St.3d 527, 531, quoting State v.Jamison (1990), 49 Ohio St.3d 182, syllabus. A certain modus operandi may provide a "behavioral fingerprint," Ristich, at ¶ 15-16, quotingLowe, 69 Ohio St.3d at 531, or "an idiosyncratic pattern of criminal conduct[.]" Ristich, at ¶ 16. "[T]he probative value of such conduct lies in its peculiar character[.]" Id. This Court concluded that the similar fact patterns established a "peculiar and unique pattern of activity" that was probative of the factors articulated in R.C. 2945.59
and Evid.R. 404(B), and was thereby admissible. Ristich, at ¶ 24.
 {¶ 55} In State v. Curry (1975), 43 Ohio St.2d 66, the Ohio Supreme Court explained that "other acts" testimony which forms part of the immediate background of the charged crime may be admissible as demonstrating a scheme, plan, or system. Id. at 72-73. The other acts must concern events which are "inextricably related" to the alleged criminal act. Id. at 73. *Page 23 
 {¶ 56} This Court relied upon this principle in another recent case. In State v. Halgrimson (Nov. 8, 2000), 9th Dist. No. 99CA007389, the defendant was convicted of menacing by stalking. He had followed his victim from Ohio to Colorado and back. On appeal, he challenged the admission of evidence of an altercation with his psychiatrist and evidence of an arrest related to contact with one of his victim's friends. The Court found that this "other acts" evidence could be useful in assisting the jury to understand that "a defendant's otherwiseinnocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress." (Emphasis added.) Id. The Court found that the "other acts" evidence was admissible because it provided information that would show a course of conduct related to the charged crime, and therefore connect the defendant's seemingly innocent behavior, his return to the city where his victim was located, to an ongoing course of conduct. Id.
 {¶ 57} Evidence that Liddle interacted with the older girls in a manner similar to the way in which he interacted with R.B., and that he even professed love to one of them, as well as evidence that Liddle possessed and used sadomasochistic devices, dressed in women's clothing, and discussed adult sexual behavior with them was admissible for the purpose of showing the sequence of events leading up to and as part of the sexual abuse of R.B. See State v. Burris, 5th Dist. No. 2004CA00016,2004-Ohio-4531, at ¶ 25 (photographs showing *Page 24 
defendant with victim in sexually provocative poses was admissible to show sequence of events leading to sexual abuse, the background of the crime). See, also, State v. Madsen, 8th Dist. No. 82399, 2003-Ohio-5822, at ¶ 27 and ¶ 32 (evidence of physical and psychological abuse of the victim and other family members, even if not included in the indictment, is permitted to show appellant's plan).
 {¶ 58} Thus, the "other acts" testimony tended to prove Liddle's scheme, plan and system, his modus operandi. The other incidents were not used to show his bad character or that he acted in conformity therewith, but, rather, demonstrated that Liddle had a plan to abuse R.B. Here, Liddle's scheme was to "groom" these young girls that were under his care and control through a "peculiar and unique pattern of activity" until they were effectively coerced into acts of deviant sexual behavior.
 {¶ 59} While some of Liddle's actions — the hugs, kisses, and sitting on his lap — may have otherwise appeared innocent, when his actions are placed in context, they demonstrate a system, plan or scheme to accomplish the crimes charged. There was evidence before the trial court that Liddle's behavior included the use of hand cuffs and sadomasochistic restraints, cross-dressing, and talk of adult sexual behavior. Because Liddle had repeated similar behavior with all three sisters — and even Mother, to some extent — this evidence provides a behavioral fingerprint, a unique and identifiable plan of criminal activity, and comes within *Page 25 
the scheme, plan, and system exception to the rule on other acts evidence, and may properly be admitted. The trial court did not abuse its discretion in allowing this evidence to be admitted.
 {¶ 60} Second, Liddle also complains about an incident where A.B. stated, upon being asked whether she was surprised by Liddle's molestation, that she was not surprised because she had been victimized by another assailant previously. Liddle argues that this testimony created sympathy for the family. There was no contemporaneous objection to this testimony in the trial court, and, in any event, it is not clear to this Court that such unsubstantiated allegations would create sympathy for the victim's family as opposed to potentially creating doubt as to their credibility in making the present allegations. We find no demonstration of prejudice.
 {¶ 61} Third, Liddle contends that the prosecutor created error when she suggested, in the presence of the jury, that R.B. witnessed Liddle engage in "similar activity" with her sister, B.B. At that point, a conference was held in chambers, after which defense counsel agreed to a curative instruction that the jury was to disregard the prosecutor's statement about similar activity. Defense counsel further agreed that the prosecutor should be permitted to ask R.B. whether the sisters sat on Liddle's lap, and whether Liddle kissed and hugged them. Given the agreed-to curative instruction and the comments by defense counsel, we find no error here. *Page 26 
 {¶ 62} Finally, appellant contends that the trial court should have resolved the admissibility of the "other acts" testimony at least three days prior to trial, pursuant to R.C. 2907.02(E) and R.C. 2907.05(E). Both sections provide, in identical terms, that the admissibility of such evidence shall be resolved "in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during trial." R.C. 2907.02(E) and R.C. 2907.05(E)
 {¶ 63} A portion of these matters were resolved at a pre-trial hearing on the state's notice of intent to introduce evidence of similar acts and the defense's motion in limine. The trial court determined that it would allow the state to explore, through middle sister B.B., Liddle's allegedly strange and inappropriate sexual behavior with B.B. as well as with R.B. The trial court resolved additional issues of the admissibility of prior sexual opinion, reputation, and activities during later discussions in chambers.
 {¶ 64} According to the Ohio Supreme Court, the major purpose of the hearing provisions of R.C. 2907.02(E) and R.C. 2907.05(E) is to insure an in camera hearing before presentation of any evidence of sexual activity takes place, as opposed to a mere discussion at the bench. SeeState v. Acre (1983), 6 Ohio St.3d 140, 143. "A side bench conference between the trial court and counsel for the state and for the defendant does not satisfy the requirements of an in camera hearing where such hearing is sought by the defendant or the victim." Id., at *Page 27 
paragraph three of the syllabus. The trial court met the requirements ofAcre by having a pre-trial hearing and follow-up hearings in chambers on matters as they developed during trial.
 {¶ 65} As noted by the First District Court of Appeals, "it is clear that the three-days-before-trial requirement was not intended by the legislature to be absolute, since the statute contemplates that for `good cause shown' the hearing may be held even during trial." State v.Napier (Dec. 30, 1999), 1st Dist. No. C-980999. Despite Liddle's claim of an "uncertain evidentiary environment" for defense counsel, the major admissibility issues were decided before trial, and the remaining questions on matters of the type that may inevitably arise in the course of trial, were resolved in chambers.
 {¶ 66} Liddle has cited State v. Cotton (1996), 113 Ohio App.3d 125, in support of his position. That case follows Acre, however, and emphasizes the need to resolve such issues in chambers as opposed to considering them at sidebar before the jury. Id. at 130. Furthermore, inCotton, no in-chambers hearing was ever held to determine the admissibility of evidence regarding allegations of prior sexual misconduct by the defendant in that case. Id.
 {¶ 67} Finally, defense counsel's failure to move for a continuance during trial constitutes waiver of any residual error. SeeAcre, 6 Ohio St.3d at paragraph four of the syllabus. We find no merit in this argument.
 {¶ 68} Liddle's first assignment of error is overruled. *Page 28 
 III. {¶ 69} Liddle's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
[1] Father testified that Mother often made it difficult for him to see his daughters. She would not have them available or ready at appointed times. He testified that he would call the girls' soccer coach to learn when they had their games and then would go to see them at their games.
[2] Father obtained full custody in May 2005.
[3] Deputy Wes Dobbins testified that, on November 19, 2004, Father made a police report, stating that he believed his daughter had been sexual assaulted by a family friend.
[4] Armsey testified that Liddle admitted Mother told him to leave the home because of his inappropriate behavior with R.B. There was also some suggestion that Liddle was told to leave because the family learned that he had a gun, and Mother and Grandmother did not want the children exposed to a weapon. And there was another suggestion that Liddle was asked to leave because Mother had a new male friend that was also living in Grandmother's home. *Page 29