JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Derold DeBlasis appeals from his conviction for gross sexual imposition. For the reasons set forth below, we affirm.
 {¶ 2} On October 10, 2001, defendant was indicted for six counts of gross sexual imposition in connection with alleged assaults upon three of his daughters. In Counts One and Two, defendant was charged with gross sexual imposition upon his then twelve-year-old daughter. Defendant plead not guilty to these and the four other charges which pertained to other children. The matter proceeded to a jury trial on February 19, 2002. The trial court acquitted defendant of Count Two at the close of the state's case. Defendant was convicted of gross sexual imposition as alleged in Count One, and defendant was acquitted of the remaining charges.
 {¶ 3} As is relevant to this appeal, the girl who was the subject of the charges set forth in Counts One and Two testified that she, her mother, and some of her siblings had been living apart from her father in Boardman, Ohio. The family subsequently reunited and moved in together in Cleveland At the Cleveland home, the girl shared a room with her sisters, her parents shared a room, but her mother usually slept on the couch. On or about September 26, 2001, when the girl was twelve, she had a cold and was coughing and sneezing. Her father gave her cold medicine and told her to sleep in his bed so that she would not get any of the other children sick. Her mother was asleep on the couch. The girl, who was wearing underwear, boxer shorts, and a sports bra, then went to sleep in her father's bed.
 {¶ 4} The girl further testified that she awoke in the middle of the night and her father was touching her vagina underneath her clothing, and was also masturbating. She then felt wet. The girl pretended to be asleep, then got up to go to the bathroom. At this time, she wiped" clear stuff" from her leg and body. When she returned, her father told her to go back to her own bedroom. The next morning, she told one of her sisters what had happened, and the sister decided to run away and take the girl with her. Later that day, while the girl was in school, she was called out of class and sent to the counselor's office. One of the counselors drove the girl to the hospital, then took her home. The girl stated that she told a doctor at the hospital what had happened and he scheduled her to see another doctor on a different day. The girl told the second doctor what had happened and he examined her and took photographs. The girl also spoke to Cleveland Police Detective Strickler.
 {¶ 5} The girl reviewed her statement to Det. Strickler and stated that she had told him the truth about what had happened, and she also stated that her clothing from the incident was given to the detective.
 {¶ 6} On cross-examination, the girl testified that, while they lived in Boardman, her father helped her with her school work, her mother did not help her, and she did better in school than she is doing now. With regard to the night of September 26, 2001, the girl testified that her father told her to sleep in his bed, then he went downstairs to sleep. About an hour later, he gave her medicine.
 {¶ 7} The girl denied going over her testimony with her mother or sisters. She also stated that the clothing she was wearing had not been washed before it was turned over to the police. Finally, the girl stated that, after the divorce, both parents had custody of her but her father had custody of her brother and one of her sisters.
 {¶ 8} Dawn Rubensaal, a counselor a Midpark High School in Berea, testified that on September 27, 2001, the sister of the girl who was the subject of Counts One and Two of the indictment asked to speak with her. After they spoke, Rubensaal arranged for this girl to speak with a social worker and the police, then walked the girl to her locker and observed that her backpack was filled with clothing and other belongings.
 {¶ 9} The mother of the girl next testified that she and defendant were divorced in 1995. She experienced financial difficulties and she and defendant decided to get back together in order to provide better care for their children. The woman further testified that defendant has fibromyalgia and suffers from some type of injury to his testicles, but he can still engage in sexual relations.
 {¶ 10} With regard to the offense at issue, the woman testified that on September 27, 2001, a Children's Services worker picked her up at her place of employment and took her to her 12-year-old's school. She met with the counselor, and police officers, then returned home with the police so that they could retrieve various items of evidence.
 {¶ 11} The woman further testified that the girl was examined at MetroHealth Medical Center and a Children's Services worker took the girl back to MetroHealth for a second examination.
 {¶ 12} On cross-examination, the woman admitted that defendant has custody of the girl who had attended Midpark, and of their son, and that she has filed for custody of these children. She also admitted that the child who attended Midpark is taking medication for emotional problems and has refused to attend school, but she stated that she considers her to be truthful most of the time. The woman acknowledged that before her divorce from defendant became final, she had two other children with another man. She has had sexual relations with defendant approximately twenty times since they began living together again, however. She also acknowledged that defendant had been the disciplinarian of the children. Finally, the woman admitted that the girl's clothing and other items were not washed before being turned over to the police.
 {¶ 13} Cleveland Police Officer Astrid Vega testified that, on September 27, 2001, she and her partner Gerald Bronson responded to the school of the 12-year-old. Defendant was in the school office and they arrested him. A separate unit transported defendant to the Justice Center and Officer Vega directed the Children's Services worker to take the girl to MetroHealth, where Vega later interviewed her. At this time, the girl told the officer that her father had given her medication, then asked her to sleep in his bed. Later, he got in bed with her, put his hand under her boxers and panties and "started grinding behind her buttocks." She then felt something wet, and defendant told her to go to her own room.
 {¶ 14} Officer Vega then spoke to the girl's mother, then collected the girl's clothes and other evidence from the house.
 {¶ 15} On cross-examination, Officer Vega admitted that defendant was cooperative but neither she nor her partner questioned defendant about the allegations.
 {¶ 16} Officer Bronson testified that the clothing of the girl tested negative for semen and blood, but a blanket retrieved from the home tested positive for semen. He admitted, however, that this was not indicative that abuse had occurred.
 {¶ 17} Dr. David Bar-Shain of MetroHealth Medical Center testified that he works with Dr. Feingold in the Alpha Clinic. He is responsible for examining children and evaluating allegations of physical or sexual abuse. Dr. Bar-Shain testified that he examined the 12-year-old on November 19, 2001, after she had been referred to the Clinic by a Children's Services social worker. He stated that there were no significant laboratory findings, but he explained that most child abuse cases do not have physical findings, and he did not expect to find them in this matter since there had been no penetration.
 {¶ 18} On cross-examination, Dr. Bar-Shain admitted that the girl was not seen until fifty or sixty days after she had been seen in the emergency room.
 {¶ 19} Laura Brewster, a social worker with the Medical Investigations Unit of the Cuyahoga County Department of Children Family Services, testified that she has had specialized training regarding the assessment of children who have been sexually abused, and has previously testified as an expert. She stated that she spoke with the girl, and the girl stated that defendant sexually molested her. Thereafter, Brewster referred her to the Alpha Clinic. The girl was hesitant, reserved, and frightened that her family would be split up.
 {¶ 20} Brewster acknowledged on cross-examination that there had been no physical findings on the girl's clothing. She admitted that she did not speak to the defendant regarding the incident and that, within her records of this matter, she did not identify the allegations as having been substantiated.
 {¶ 21} Det. Alan Strickler of the Cleveland Police Sex Crimes Child Abuse Unit testified that he was assigned to investigate this case and spoke to the defendant and the victim. According to Det. Strickler, defendant seemed distraught and also seemed to have some sort of physical handicap which impaired his ability to walk. After he explained the potential charges to defendant, defendant broke down. Defendant ultimately stated that he did not understand his constitutional rights, then spontaneously uttered that he did not know if he needed a psychiatrist or hypnotist in order to find out what had actually happened. Det. Strickler further testified that he brought evidence obtained from the home to the Scientific Investigative Unit for analysis.
 {¶ 22} Det. Strickler admitted on cross-examination that a blanket recovered from the home tested positive for semen but that all other items tested negative for blood and semen.
 {¶ 23} Following the presentation of the state's case, the trial court acquitted defendant of Count Two of the indictment. Defendant elected to testify on his own behalf, and stated that he and the girl's mother were married in 1985. They separated in 1990 but did not finalize their divorce until 1995 when defendant became interested in another woman. Defendant testified that he served in the Navy and during his service, he contracted a malaria-related illness which damaged his genitals and has had eight surgical procedures. Defendant stated that it is painful for him to become sexually aroused and to have sex. He also stated that he suffers from fibromyalgia, and receives social security disability payments. His minor children also receive children's benefits due to his disability. The benefits for his younger children go to their mother as their custodian. Prior to trial, he obtained custody of the older children and now receives the benefits for them.
 {¶ 24} Defendant also stated that he sells items at a flea market, has a computer-based business which helps people start home businesses, and also promotes Christian music.
 {¶ 25} Defendant next testified that the girl's mother had moved many times since their separation and, on many occasions, he could not locate her or the children. During the time when he, his ex-wife and the children lived together, he would get them ready for school, drive them to school, and help them with their homework. The children did well in school.
 {¶ 26} With regard to the charge, defendant stated that the children were permitted to sleep in his bed if they had a nightmare or felt sick, but he denied ever engaging in inappropriate behavior with them. He stated that on September 26, 2001, the 12-year-old had a cold and he gave her medicine at 8:30 p.m. and again at 12:30 a.m. After the second dose, he sent her back to her own bed. He denied committing gross sexual imposition. Defendant stated that he believed that the girl had lied because she is under the influence of his older daughter, who does not like him because he is strict. Other than Det. Strickler, none of the other witnesses for the state attempted to contact him about the charges or apprise him of what was happening.
 {¶ 27} On cross-examination, defendant stated that he receives no payment from the computer-based company, and does not net a profit from his work at the flea market. He also admitted that the Navy disputes his disability and his social security benefits pertain to the pending Navy claim and his numerous surgical procedures. He also admitted that he has had a vasectomy.
 {¶ 28} Defendant was subsequently convicted of Count One and acquitted of all the remaining charges. The trial court determined that imprisonment was consistent with the purposes of R.C. 2929.11, and sentenced defendant to five years imprisonment. The court further determined that defendant was a sexually oriented offender. Defendant now appeals and assigns three errors for our review.
 {¶ 29} Defendant's first assignment of error states:
 {¶ 30} "The defendant was deprived of his right to due process of law in violation of the United States Constitution and of his statutory and procedural rights when the trial court refused to allow defense counsel to inspect prior out-of-court written statements made by the state's witnesses."
 {¶ 31} Within this assignment of error, defendant complains that the trial court erred in refusing to allow his trial counsel to review a written statement made by defendant's 11-year-old daughter. We note that the jury acquitted defendant of both charges pertaining to this girl. In addition, the state's evidence pertaining to this child was not interrelated with its evidence pertaining to the 12-year-old. We therefore conclude that any error in connection with this ruling is harmless beyond a reasonable doubt. Cf. Crim.R. 52(A); Chapman v. California
(1967), 386 U.S. 18, 24, 17 L.Ed.2d 705, 87 S.Ct. 824; Statev. Frazier (Feb. 14, 1996), Hamilton App. No. C-950108; Statev. Halgrimson (Nov. 8, 2000), Lorain App. No. 99CA007389; Statev. Queen (July 5, 2001), Medina App. No. 3115-M. The first assignment of error is overruled.
 {¶ 32} Defendant's second assignment of error states:
 {¶ 33} "A violation of defendant's due process rights occurred when the state failed to make a thorough and timely investigation of readily available physical evidence. The state failed to test the DNA on semen found at the scene; and, the examinations for sexual assault of the complainants were delayed until several weeks after the allegations were reported. The state's evidence lacked sufficiency because of its failure to exercise due diligence in its scientific investigation."
 {¶ 34} Within this assignment of error, defendant complains that the state presented insufficient evidence in support of the conviction because it did not test a semen sample for DNA, that it was error to permit Dr. Bar-Shain to testify because his name was not on the witness list, and that Dr. Bar-Shain exceeded the limitations which the trial court imposed upon the scope of his testimony.
 {¶ 35} With regard to the first of these issues, we note that the state has no constitutional duty to perform any particular forensic test on evidence which it collects. See Arizona v.Youngblood (1988), 488 U.S. 51, 59, 102 L.Ed.2d 281,109 S.Ct. 333. See, also, State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617; State v. Wooten, Athens App. No. 01CA31, 2002-Ohio-1466; State v. Kent (June 18, 1998), Cuyahoga App. No. 72435.
 {¶ 36} In this matter, the state was not required to perform a DNA analysis on the blanket, and the state preserved the evidence for analysis by the defense. Accordingly, no error has occurred in connection with the state's handling of this evidence.
 {¶ 37} With regard to the second issue, the court's decision to allow Dr. Bar-Shain to testify despite the fact that he was not identified as a state's witness prior to trial, the record reveals that the defense ultimately withdrew its objection after a discussion in chambers. (Tr. 14). The record further reveals that the state had previously identified Dr. Bar-Shain's partner at the Alpha Clinic, and that the defense did not consent to the state's continuance of the trial in order for the defense to interview Dr. Bar-Shain. Accordingly, we cannot conclude that reversible error occurred in connection with the trial court's decision to allow this testimony. See State v. Heinish (1990),50 Ohio St.3d 231, 553 N.E.2d 1026; Crim.R. 16(E)(3).
 {¶ 38} As to the third issue of whether Dr. Bar-Shain exceeded the trial court's admonishment that his testimony pertain only to the fact that he performed a physical examination, found no evidence supporting the allegations, and could speak about his experience as an expert in abuse cases, our review of the testimony does not show that the doctor exceeded these parameters.
 {¶ 39} The second assignment of error is without merit.
 {¶ 40} Defendant's third assignment of error states:
 {¶ 41} "The defendant was deprived of his right to due process of law in violation of the Ohio Rule of Evidence 611(C) in that the trial court violated its discretion by allowing the prosecution to lead the witness and supply answers to the witness in derogation of his procedural rights."
 {¶ 42} Evid.R. 611(C) provides that leading questions cannot be used on direct examination of a witness "except as may be necessary to develop his testimony."
 {¶ 43} "The exception `except as may be necessary to develop his testimony' is quite broad and places the limits upon the use of leading questions on direct examination within the sound judicial discretion of the trial court." State v. Lewis (1982),4 Ohio App.3d 275, 278, 448 N.E.2d 487; State v. Madden (1984),15 Ohio App.3d 130, 133, 472 N.E.2d 1126, 1130; State v. Smith
(1977), 59 Ohio App.2d 194, 203, 392 N.E.2d 1264.
 {¶ 44} Courts have continued to emphasize the latitude given the trial court in such matters, especially in cases involving children who are the alleged victims of sexual offenses. SeeState v. Miller (1988), 44 Ohio App.3d 42, 541 N.E.2d 105;State v. Madden, supra; State v. Matheny, 5th Dist. No. 2001 AP070069, 2002-Ohio-1120; State v. Mader (Aug. 30, 2001), Cuyahoga App. No. 78200.
 {¶ 45} In this case, we find no abuse of discretion. The leading questions were limited and were generally followed with other questions which required the girl to provide additional information.
 {¶ 46} The third assignment of error is overruled.
 {¶ 47} Affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, P.J., and McMonagle, J., Concur.