[Cite as *State v. Moffitt*, 2016-Ohio-5861.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. E-15-034 |
| Appellee | Trial Court No. 2013-CR-523 |
| v. | |
| Joseph Moffitt | **DECISION AND JUDGMENT** |
| Appellant | Decided:  September 16, 2016 |

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Mary Ann Barylski, Chief Assistant Prosecutor, for appellee.

Loretta Riddle, for appellant.

* * * * *

**JENSEN, P.J.**

**{¶ 1}** Following a jury trial, defendant-appellant, Joseph J. Moffitt, appeals the November 20, 2014 judgment of the Erie County Court of Common Pleas, convicting him of felonious assault and complicity to commit tampering with evidence.  For the following reasons, we affirm the trial court's judgment.

## I.  Background

{¶ 2} Around 1:30 a.m. on November 23, 2013, Sandusky police responded to a report of a fight outside a bar called Daly's.  They arrived to find that Jason Dendy, III, had been stabbed several times in the abdomen and hand.  Joseph Moffitt was charged with felonious assault and tampering with evidence in connection with Dendy's stabbing.  The circumstances surrounding the stabbing were disputed and the case went to a jury trial.  Moffitt's defense was essentially that it was his friend, Dustin Ramsey—not Moffitt—who stabbed Dendy.  Witnesses, many of whom were intoxicated at the time of the incident, described what they observed.

{¶ 3} Dendy testified that he, his girlfriend, Jeanette Charlton, his friend, Korey Robinson, and Robinson's girlfriend, were leaving Daly's between 12:30 and 1:00 a.m.  Moffitt and Ramsey were standing outside the bar talking.  Robinson believed that they were talking to him and he confronted them.  Robinson and Ramsey began fighting and Dendy saw Robinson punch Ramsey.  Dendy believed that Moffitt was coming to Ramsey's aid, so Dendy went to assist Robinson.  He and Moffitt began to fight, Moffitt fell to the ground, and Dendy was standing over him.  Charlton pulled Dendy off of Moffitt and they started walking to their car.  At that point Charlton noticed that Dendy was bleeding from his stomach.  She applied pressure to the wound and called the police.

{¶ 4} Dendy was transported by ambulance to Firelands Hospital and was later life-flighted to Cleveland.  He suffered stab wounds to both the right and left sides of his abdomen, his left thumb was nearly severed, and his lung was punctured.  He spent 12

2.

days in the hospital and underwent multiple surgeries. He identified Moffitt as the person with whom he fought that night. He recalled his distinctive red or orange neck tattoos, and described that Moffitt had light brown hair. Dendy testified that as between he and Robinson—who he estimated to be between 5'6" to 5'7"—Dendy is the shorter of the two. Dendy and Robinson's relative heights are of significance because many of the witnesses' identifications of the participants in the fights were based on physical descriptions, including height.

{¶ 5} Charlton testified that when they left Daly's, Moffitt and Ramsey were outside the bar yelling and trying to start a fight with them. She said that Robinson engaged in an argument with Ramsey and eventually punched him. Moffitt started walking toward them and Dendy tackled him. She ran over to Dendy to pull him off of Moffitt. After she succeeded in doing so, she noticed that his stomach was bleeding. She applied pressure to the wound and called 9-1-1.

{¶ 6} Moffitt tried to leave, so Charlton ran over to stop him, pulled on his legs, and caused him to fall. She said he spit in her face and yelled, "Get off me, bitch." He got up and walked toward a row of vehicles. He opened the door and tried to throw something silver and shiny into the passenger side of a vehicle, which she described as a Bronco. She slammed the door shut and Charlton believed that Moffitt then threw the item under the car. When police arrived, she told them the knife was under the car. Officers assured her that they retrieved it. Charlton did not witness the stabbing, but she recalled that Ramsey yelled that he had a knife. She identified Moffitt as the only person

3.

with whom Dendy fought that night. She too recalled his red neck tattoos. She also recalled that Moffitt's hair was darker than Ramsey's, whose hair was blonde.

{¶ 7} Ramsey testified as part of a plea agreement. He had been charged with misdemeanor assault in connection with his fight with Robinson, as well as aggravated assault, a second degree felony, in connection with Dendy's stabbing. Ramsey agreed to testify truthfully against Moffitt in exchange for dismissal of the aggravated assault charge. At the time of Moffitt's trial, he had not yet been sentenced.

{¶ 8} Ramsey testified that he and Moffitt had known each other for nine years and had a strong friendship. On the evening in question, they went to Daly's to celebrate Ramsey's new job at Papa John's. After consuming much alcohol, Ramsey went outside to smoke and to talk to a woman. He went back inside to vomit, then went outside again with Moffitt. According to Ramsey, Dendy and his friends got kicked out of Daly's for causing problems, then instigated an argument with Ramsey and Moffitt. Ramsey described that Moffitt and Dendy began fighting one another, he stepped in to try to break it up, then Robinson began to fight Ramsey. Ramsey was punched in the mouth several times. He heard a woman scream and looked over to see that Dendy had been stabbed. On cross-examination, Ramsey testified that Moffitt and Robinson initially fought but when Ramsey intervened to break it up, Moffitt ended up fighting Dendy and Ramsey fought Robinson.

{¶ 9} Ramsey testified that he and Moffitt went to the Dodge Ram that they had driven to the bar. Moffitt went to the passenger side. Ramsey grabbed his marijuana and

4.

marijuana pipe from the vehicle and the two were going to walk, but the police arrived and apprehended them. Ramsey admitted that both he and Moffitt owned knives; Ramsey's was black with a scorpion and an ember on the handle, and Moffitt's was an AK-47 with a black blade and a black handle. Ramsey denied ever stating to Dendy and Robinson that he had a knife. He claimed that there was a third man involved, whose name he did not know, who said that *he* had a knife.

{¶ 10} Ramsey explained that his memory of the incident was foggy. He contended that Moffitt attempted to take advantage of this by trying to convince Ramsey that it was he who stabbed Dendy. Moffitt tried to persuade Ramsey that he had less to lose because unlike Moffitt, Ramsey did not have a wife or children. Ramsey denied being the perpetrator but he said that to calm Moffitt down, he admitted to it. Moffitt apparently recorded the conversation. Ramsey at one point spoke to his attorney about what would happen if he took responsibility for the stabbing, but ultimately decided that he would not admit to something he did not do.

{¶ 11} Ramsey described that at the time of the incident, his hair was blonde and he was wearing a black shirt and a gray coat. He conceded that like Moffitt, he also has a neck tattoo.

{¶ 12} Two additional witnesses testified for the state. Ivan Combellack testified that he was at Daly's that night and heard a ruckus, so he went outside. He witnessed the physical altercation. He saw blood on the victim who he described as a short black male. He said the person that Dendy was fighting was white, had dark hair, and was wearing a

5.

black shirt. That person then walked toward the passenger side of a vehicle that Combellack described as a green truck. He observed a woman yelling, trying to prevent the perpetrator from getting into the vehicle. Combellack was interviewed by police officers that evening. He could not identify the assailant.

{¶ 13} Derek Olenek also testified. He knows Moffitt and Ramsey. He and Moffitt were classmates beginning in junior high or high school. Olenek was at Daly's that night and saw Ramsey and Moffitt there, first inside the bar and later outside. He saw Ramsey scuffle with an African-American male. He said that Moffitt was not initially involved, but then another African-American male approached and they exchanged words. Ramsey was fighting the taller of the two African-American men, and Moffitt was fighting with the shorter one. He described that as between Ramsey and Moffitt, Ramsey appeared to be the more aggressive of the two. Olenek heard a glass break and his attention was diverted again to Ramsey. He then heard a woman yell that the shorter male had been stabbed and he saw that the victim had blood on him all around his midsection. Olenek did not see a knife and did not see the stabbing. He also never heard Ramsey yell that he had a knife. Olenek described that Ramsey and Moffitt were walking away as the police arrived. He did not recall Ramsey being in a car when the police got there. Like Combellack, Olenek spoke to officers that night.

{¶ 14} During Olenek's testimony, he was asked if he knows Chase Clinton, a classmate of Olenek and Moffitt who claimed to be at Daly's that night and would be

6.

testifying for the defense. He said that he did, but denied seeing Clinton at Daly's that night.

{¶ 15} Two of Moffitt's friends testified for the defense. Clinton was one of them. Despite the fact that Olenek denied seeing him at Daly's, he testified that he was there that evening. He said that when he left the bar, he saw Moffitt outside waiting for Ramsey. He invited Moffitt to another bar and Moffitt said he would meet him there. Clinton heard a commotion and turned to see Moffitt fighting with one man and Ramsey fighting with another. He described the man Ramsey was fighting as a short, bald, African-American man. He said he saw a girl pull that man off Ramsey and when she did, he saw that the man's shirt was bloody. Clinton said he saw something black and "pointed" in Ramsey's hand, but did not know if it was a knife.

{¶ 16} Clinton did not speak to officers on the scene. He said he ran because he did not want to be involved and because he does not trust police. He said that although the incident happened many months ago, he learned only recently that Moffitt was accused of stabbing the man. He claimed that once he found out that Moffitt was being tried, he contacted defense counsel instead of the police. Clinton admitted that Sergeant Dana Newell left a business card for him, but he never contacted the detective.

{¶ 17} Brittney Kessler also testified for the defense. Kessler is Ramsey's ex-girlfriend, however, she began dating Moffitt's landlord—a friend of Moffitt's. Kessler said that Ramsey spoke about the incident at Daly's on and off when he was drunk or high. She said that at first, he claimed to have been "roofied" that night, but later

7.

admitted that he had only been drinking. Kessler claimed that Ramsey told her that he felt bad for everything that had happened and said he had just been looking for a fight. However, she also testified that Ramsey admitted to stabbing Dendy and said that "he should have just killed the nigger instead of stabbing him." She said that Ramsey told her that a girl pulled Dendy off of him and there was blood all over him.

{¶ 18} Kessler conceded that despite knowing that Moffitt was facing charges, she never went to the police. She also admitted that Sergeant Newell came to her house to talk to her, but she told him that she could not talk right then. She told him she would come down to the police station later, but she never did because she has "a very busy lifestyle." Instead, she contacted Moffitt's attorney. Kessler described Ramsey's tattoos. She described that Moffitt and Ramsey had matching tattoos.

{¶ 19} In addition to these fact witnesses, a number of law enforcement personnel testified. Sergeant Eric Graybill, of the Sandusky Police Department, responded to the fight at Daly's. As he arrived, he was told they had a stabbing victim. Charlton indicated that the subjects, ultimately identified as Moffitt and Ramsey, were across the street near a Dodge vehicle. Witnesses at the scene said the subjects had hidden the knife near or inside the vehicle. They searched the immediate area for the knife. No knife was found under the vehicle. A check of the vehicle's registration revealed that the vehicle belonged to Moffitt. Moffitt declined to consent to a search of his vehicle, so they towed it and Sergeant Newell obtained a search warrant. Moffitt and Ramsey were taken into custody. Sergeant Graybill stayed with Dendy.

8.

{¶ 20} Officer Ken Gautschi, a senior patrol officer, also testified. He too responded to Daly's that evening. When he arrived, people were yelling that someone had been stabbed. Moffitt was coming around the passenger side of a Dodge truck and Officer Estep ordered Moffitt to the ground. Officer Gautschi saw Ramsey exit through the driver's side of the truck and Ramsey started to approach him quickly. He ordered Ramsey to stop and put his hands up and he noticed blood on Ramsey's coat and jeans. Officer Gautschi patted him down and found a marijuana pipe with marijuana residue in it, but found no weapons. He placed Ramsey under arrest for possession of marijuana and drug paraphernalia and for disorderly conduct while intoxicated. He sat Ramsey in the back of his cruiser. Ramsey said that he did not know about the stabbing and denied stabbing anyone. He said that Moffitt and Robinson first began fighting, and he insisted that he was trying to break it up. Officer Gautschi secured Ramsey's jacket and jeans at the jail. He described that Ramsey's hair was blonde with some red mixed in. He was wearing a black t-shirt.

{¶ 21} Officer Evan Estep also responded to the call to Daly's. He first saw Charlton who was yelling that her boyfriend had been stabbed. She identified Moffitt as the perpetrator. Officer Estep saw that Ramsey was at the driver's side of the vehicle and Moffitt was half in and half out of the passenger side. Officer Estep ordered Moffitt to the ground and detained him at that point. He observed that Moffitt was wearing a black t-shirt and had a good amount of blood on his shirt and jeans. Officer Estep did not

9.

observe any injuries on Moffitt, but he observed that Moffitt appeared to be very intoxicated. He secured Moffitt's clothing and shoes at the jail.

{¶ 22} Sergeant Dana Newell is a detective with the Sandusky Police Department. He was the on-call detective the evening of the incident. He applied for the warrant to search Moffitt's vehicle and conducted the search. In the middle console of the vehicle he discovered a knife with a scorpion on it, which he secured. He also found a black knife with an "AK-47" marking in the back passenger seat, which he also secured. That knife had what he suspected to be blood on it.

{¶ 23} Sergeant Newell interviewed Ramsey because he was told he had confessed. He does not know why Ramsey's shoes were not taken and he conceded that if there was blood on the shoes it could be an indication of who did the stabbing. He did not send Ramsey's pants to the Bureau of Criminal Investigation ("BCI") for testing because he said that he did not want to overload BCI with evidence. He did not know if there was blood on Moffitt's hands. Sergeant Newell said that during his interview of Charlton she said something about Ramsey saying that he had a knife and something about stabbing Robinson. Sergeant Newell tried talking to both Clinton and Kessler, but neither responded to him. Sergeant Newell interviewed Dendy and collected a DNA sample from him. He said that Deputy Nick Kotsopoulos, an Erie County sheriff's deputy, collected Moffitt and Ramsey's DNA samples. Sergeant Newell signed a release for the samples and sealed them in a manila envelope.

10.

{¶ 24} Deputy Kotsopoulos testified that Ramsey and Moffitt consented to providing DNA swabs. He confirmed that he took the swabs and handed them over to Sergeant Newell.

{¶ 25} Officer Matthew Dunn, an evidence officer with the Sandusky Police Department, testified. He said that he is responsible for transporting evidence to the BCI lab in Bowling Green. He transported the evidence in this case. He discussed the steps they take to avoid contamination of evidence.

{¶ 26} Finally, BCI investigators testified. Vicki Bartholomew works in the latent print section of the BCI lab in Bowling Green. She explained that she analyzed the evidence for the presence of fingerprints, but there was not sufficient ridge detail on the items for comparison purposes.

{¶ 27} Julie Cox, a scientist in the forensic biology section of BCI's Bowling Green lab, described the process for determining which items the lab will test. She described the items that were submitted for analysis, and she explained that she makes decisions about what is probative with input from the case investigator. She testified that no blood was identified on the scorpion knife. There was blood on the AK-47 knife, on Ramsey's coat, and on Moffitt's shirt. Small samples of the shirt and coat were extracted and forwarded to BCI's London Headquarters for testing. She testified that because they already found blood on the coat, it would not be very helpful to test other items worn by the same person.

11.

{¶ 28} Finally, Raymond Peoples testified. He is a forensic scientist with the BCI London office's DNA section. He tested the blade of the knife, the handle of the knife, the cuff of Ramsey's coat, the back of Ramsey's coat, and a sample from Moffitt's shirt. It was determined that a mix of DNA was present on the handle of the knife, but was not suitable for including or excluding potential contributors. The DNA profile from the cuff of Ramsey's coat was also not suitable for comparison purposes. Analysis of the back of Ramsey's coat revealed a mixed profile, with "the major profile" being Dendy's and "the minor profile" being unsuitable for inclusionary purposes. And the DNA profile on the blade of the knife and on Moffitt's shirt was consistent with Dendy's.

{¶ 29} The jury found Moffitt guilty of felonious assault, a violation of R.C. 2903.11(A)(2), and complicity to tampering with evidence, a violation of R.C. 2923.03(A)(2) and 2921.12(A)(1). The trial court sentenced Moffitt to a total prison term of seven years. Moffitt appealed, and he assigns the following errors for our review:

ASSIGNMENT OF ERROR NO. I

PLAIN ERROR WAS CONMITTED [SIC] WHEN THE STATE WAS PERMITTED TO INTRODUCE DNA EVIDENCE FROM SOMEONE WHO WAS NOT QUALIFIED TO COLLECT DNA EVIDENCE.

ASSIGNMENT OF ERROR NO. II

APPELLANT'S CONSTITUIONAL [SIC] RIGHTS ARE VIOLATED WHEN THE STATE AND ITS AGENTS HAVE A

WRITTEN POLICY TO DETERMINE WHAT IS BEST EVIDENCE

AND LIMIT THE TESTING OF EVIDENCE THAT IS EXCLUPATORY

FOR THE DEFENDANT.

ASSIGNMENT OF ERROR NO. III

THE JURY'S VERDICT WAS AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE.

ASSIGNMENT OF ERROR NO. IV

APPELLANT RECEIVED CONSTUTIONALLY INEFFECTIVE

ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL DID NOT

OBJECT TO THE INAPPROPRIATE COLLECTION OF DNA

EVIDENCE AND DID NOT HAVE EXCLUPATORY ITEMS TESTED.

## II.  Law and Analysis

{¶ 30} Moffitt contends that Deputy Kotsopoulos was not qualified to collect DNA swabs, that the procedure for selecting evidence to test for DNA violates his right to due process, and that trial counsel was ineffective for failing to object on these bases. He also claims that the jury's verdict was against the manifest weight of the evidence. We address each of these arguments in turn.

### A.  Collection of DNA Evidence

{¶ 31} In his first assignment of error, Moffitt claims that the state failed to establish that Deputy Kotsopoulos was qualified to collect DNA evidence from Moffitt, Ramsey, and Dendy.  He claims that there was no testimony regarding his training and no

13.

training certificate was offered into evidence. Moffitt maintains that this violated his right to equal protection and due process.

{¶ 32} Because Moffitt failed to object to Deputy Kotsopoulos' qualifications in the trial court, he has waived all but plain error. The plain error doctrine represents an exception to the usual rule that errors must first be presented to the trial court before they can be raised on appeal. It permits an appellate court to review an alleged error where such action is necessary to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). In order to prevail under a plain error standard, an appellant must demonstrate that there was an obvious error in the proceedings and, but for the error, the outcome clearly would have been otherwise. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62.

{¶ 33} Deputy Kotsopoulos testified that he collected DNA samples from Moffitt and Ramsey—Dendy's DNA was actually collected by Sergeant Newell. He explained the procedure for obtaining the samples:

> We have Integri swabs. They're a little cotton stick that – it looks like a big Q-tip is what it looks like with a wooden handle with a plastic cover on 'em, and we wear gloves – well, first of all, we would – we would talk to the individual and ask them for consent to do this, explain to them that a gumline saliva swab is inside your cheek, kind of like where the dentist works on your teeth or your gums, and we just take that Q-tip and we open the cap and then you push it through to get to the cotton and just

rub on the – on the gums. * * * We pull the cotton swab back into the little plastic container, close the cap, and that we seal that up into an evidence bag. Usually we'll put it in an envelope because paper is the best thing to put any kind of body fluid for DNA is to seal it up in paper, so [sic].

{¶ 34} R.C. 2901.07(C) governs the collection of DNA specimens. While the collection of DNA via a blood draw or similarly invasive procedure must be performed by "a physician, registered nurse, licensed practical nurse, duly licensed clinical laboratory technician, or other qualified medical practitioner" in a "medically approved manner," there is no such requirement when the specimen is collected by swabbing for buccal cells—i.e., cells collected from the mouth or cheek.

{¶ 35} While Moffitt alleges that Deputy Kotsopoulos was not qualified to collect DNA, he neglects to describe what qualifications the state was required to establish. Deputy Kotsopoulos explained that he oversees the department's evidence lab. He testified that he was trained in evidence collection through the state OPOTA (Ohio Peace Officer Training Academy), received hands-on training, and has collected DNA swabs in the past. Moffitt has failed to establish what more—if anything—was required.

{¶ 36} We, therefore, find Moffitt's first assignment of error not well-taken.

### B. Best Evidence

{¶ 37} In his second assignment of error, Moffitt, citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), contends that his due process rights were violated because the state withheld potentially exculpatory evidence. He bases this claim

15.

on testimony about BCI's "best evidence policy." That policy is used to determine which samples BCI will test in criminal cases. Cox explained what is meant by "best evidence":

It's not uncommon in any given investigation that the investigators would collect hundreds, if not more, items of evidence, and we, as a state agency, cannot possibly accept every single item that's been collected at the scene. We will use what we call the best evidence policy within BCI to help us narrow down our examination, and we'll start with those items that are most probative in the case, and we'll do this by having a discussion with the investigator or the detective or the prosecutor even and help us find out which of the first maybe five items are most probative.

We'll start our exam there, see what results we get, and if we get probative results or results that help to answer any questions that the investigators have, we'll stop at that point. If we don't get all the questions answered, we'll move on to the next maybe five items that are most probative to the case until we either answer all the questions or exhaust every piece of evidence that has been collected for that particular investigation.

**{¶ 38}** Peoples elaborated:

Basically when agencies, law enforcement agencies submit evidence to the lab, you know, we try to prioritize the evidence that probably would share, give the most information regarding questions surrounding the case.

16.

So it's basically, you know, taking in, you know, kind of prioritizing evidence as it comes in, knowing that, if needed, we can always go back to additional testing of additional pieces of evidence.

{¶ 39} The state counters that due process does not require the state to conduct DNA testing on all available evidence. It also points out, again, that Moffitt failed to raise this objection in the trial court, thus this assignment of error must be evaluated under a plain error analysis.

{¶ 40} Under *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *State v. Davis*, 6th Dist. Ottawa No. OT-09-032, 2010-Ohio-4383, ¶ 46, citing *Brady*, 373 U.S. at 87. Evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Meza*, 6th Dist. Lucas No. L-03-1223, 2005-Ohio-1221, ¶ 25, citing *Brady* at paragraph five of the syllabus. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Importantly, "the state has no constitutional duty to perform any particular forensic test on evidence which it collects." *State v. DeBlasis*, 8th Dist. Cuyahoga No. 81126, 2004-Ohio-2843, ¶ 35.

{¶ 41} Moffitt fails to cite any authority for the proposition that the BCI policy for selecting which evidence to test violates *Brady*. He also fails to identify which particular

17.

pieces of evidence should have been tested and fails to allege that—or explain how—the result of the trial would have been different had additional items been tested.

{¶ 42} We, therefore, find Moffitt's second assignment of error not well-taken.

### C.  Manifest Weight

{¶ 43} In his third assignment of error, Moffitt challenges the jury's verdict as against the manifest weight of the evidence.  He claims that there was conflicting evidence as to who fought Dendy and many of the eyewitnesses were not reliable because they had been drinking heavily.  He also contends that "expert testimony could not place Mr. Moffitt's finger prints on the knife and the DNA evidence regarding the blood could not support the jury's verdict."  He insists that there was no blood on his hands despite the claim that he stabbed Dendy and that Dendy was on top of him.  And with respect to the tampering with evidence conviction, he maintains that despite Charlton's testimony to the contrary, no knife was found under the vehicle.

{¶ 44} Despite raising a manifest-weight challenge, Moffitt incorrectly cites the standard for evaluating the sufficiency of the evidence.  When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  Unlike a sufficiency-of-the-weight challenge, in a manifest-weight challenge, we do not

18.

view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 45} Here, the DNA analysis clearly showed that Dendy's blood was on the knife that belonged to Moffitt, but both Moffitt and Ramsey had the victim's blood on their clothes. The jury was forced to rely, therefore, on the witnesses' testimony and to make credibility determinations based on their observations.

{¶ 46} Here, everyone except for Clinton and Kessler testified that it was Moffitt with whom Dendy had been fighting. Significantly, Clinton claimed to have been at the scene of the incident, but Olenek knows Clinton and said he did not see him there. Kessler, who was not at the scene, was the co-defendant's *ex*-girlfriend. The jury may have viewed her testimony with skepticism, especially in light of the fact that Kessler is now dating one of Moffitt's friends. It may have also found it significant that Clinton and Kessler failed to speak with Sergeant Newell, instead contacting defense counsel just before trial.

{¶ 47} Dendy and Charlton provided a description of Moffitt's red tattoo. Photos of Moffitt and Ramsey admitted into evidence reveal that while both had neck tattoos, Moffitt's tattoos are more prominent and a bright red tattoo is visible on Moffitt's neck.

19.

In addition to this, Olenek, an independent witness, knows Moffitt and clearly saw that Moffitt was fighting the shorter of the two African-American males—Dendy. And Charlton, Olenek, and Combellack all saw the individual who fought Dendy retreat to the passenger side of the vehicle.

{¶ 48} While Ramsey's testimony was likely scrutinized by the jury because he had entered into a plea agreement, his testimony was, in large part, consistent with Dendy and Charlton's. It was within the province of the jury to believe or disbelieve Ramsey's version of events. *See, e.g., State v. Ivy*, 8th Dist. Cuyahoga No. 93250, 2010-Ohio-2463, ¶ 22 (concluding that jury had not lost its way in choosing to believe testimony of state's witnesses who had accepted plea agreements that reduced charges against them).

{¶ 49} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. An appellate court "will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794, ¶ 102, citing *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 Ohio App. LEXIS 4873 (Oct. 24,

20.

1997).  Here, the jury believed the state's witnesses.  We find no manifest error in its conclusion.

{¶ 50} Finally, with respect to the tampering conviction, the jury could reasonably conclude that Moffitt, knowing that police officers were on their way, threw the knife into the back seat of the truck for the purpose of concealing the knife and impairing its availability as evidence.

{¶ 51} We, therefore, find Moffitt's third assignment of error not well-taken.

### D.  Ineffective Assistance

{¶ 52} Finally, Moffitt claims that trial counsel was ineffective for failing to raise an objection in the trial court as to the lack of the sheriff deputy's qualifications to collect DNA evidence, and as to BCI's policy of determining which items it will test for DNA.

{¶ 53} In order to establish a claim for ineffective assistance of counsel, the appellant must show that counsel's performance fell below an objective standard of reasonableness and that he was prejudiced to a degree that deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 699-692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The appellant must prove "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-88.

{¶ 54} In light of our conclusions with respect to Moffitt's first and second assignments of error, we reject Moffitt's claim of ineffective assistance of counsel. Accordingly, we find his fourth assignment of error not well-taken.

21.

### III.  Conclusion

**{¶ 55}** We find all of Moffitt's assignments of error not well-taken and we affirm the November 20, 2014 judgment of the Erie County Court of Common Pleas.  Moffitt is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.        

_____
JUDGE

Stephen A. Yarbrough, J.      

James D. Jensen, P.J.        
CONCUR.

_____
JUDGE

_____
JUDGE