[Cite as *State v. Schultz*, 2023-Ohio-4228.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 30407 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RICHARD SCHULTZ | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 19 01 0357 |

DECISION AND JOURNAL ENTRY

Dated: November 22, 2023

CARR, Judge.

{¶1} Defendant-Appellant, Richard Schultz, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} A grand jury indicted Schultz for sexually abusing the two daughters he shares with A.F. ("Mother"). With respect to the older daughter, J.S., he was indicted on eight counts of rape, one count of sexual battery, and seven counts of gross sexual imposition. With respect to the younger daughter, B.S., he was indicted on three counts of rape and three counts of gross sexual imposition. The State later dismissed a total of eight counts. Accordingly, only the following counts were submitted to the jury at trial: (1) five counts of rape as to J.S.; (2) one count of sexual battery as to J.S.; (3) four counts of gross sexual imposition as to J.S.; (4) two counts of rape as to B.S.; and (5) two counts of gross sexual imposition as to B.S. The different counts alleged that Schultz sexually abused J.S. and B.S. during distinct time periods when they were specific ages.

**{¶3}** The jury found Schultz not guilty of one count of rape and one count of gross sexual imposition, both of which pertained to J.S. The jury found Schultz guilty of his remaining charges. The trial court sentenced him to a total of thirty years to life in prison and classified him as a Tier III sexual offender.

**{¶4}** Schultz now appeals from his convictions and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE CONVICTIONS IN THIS CASE SHOULD BE REVERSED AS THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AS THE EVIDENCE SUPPORTING THEM WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE A CONVICTION BEYOND A REASONABLE DOUBT.

**{¶5}** In his assignment of error, Schultz challenges both the sufficiency and the weight of the evidence supporting his convictions. We reject his arguments.

**{¶6}** Initially, we note that "[a] review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 18. For this reason, "it is not appropriate to combine a sufficiency argument and a manifest weight argument within a single assignment of error." *State v. Mukha*, 9th Dist. Wayne No. 18AP0019, 2018-Ohio-4918, ¶ 11. The Ohio Rules of Appellate Procedure allow an appellate court to disregard an assignment of error if a party "fails to argue the assignment separately in [his] brief * * *." App.R. 12(A)(2). "Nonetheless, we exercise our discretion to consider the merits of [Schultz'] combined assignment of error." *State v. Walter*, 9th Dist. Wayne No. 20AP0020, 2022-Ohio-1982, ¶ 17. *Accord State v. Seibert*, 9th Dist. Wayne Nos. 20AP0013, 20AP0014, 2021-Ohio-3069, ¶ 13.

Sufficiency of the Evidence

**{¶7}** Crim.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

**{¶8}** When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

**{¶9}** A person commits rape if he engages in sexual conduct with another who is not his spouse and who "is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). A person commits sexual battery if he engages in sexual conduct with another who is not his spouse and who is his child. R.C. 2907.03(A)(5). Finally, a person commits gross sexual imposition if he has sexual contact with another who is not his spouse and who is "is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).

**{¶10}** Schultz argues his convictions are based on insufficient evidence because the State relied solely on the testimony of J.S. and B.S. According to Schultz, their testimony was riddled with inconsistencies. In reviewing the sufficiency of the evidence, however, "this Court is not

charged with resolving evidentiary conflicts nor assessing the credibility of witnesses." *State v. Hawkins*, 9th Dist. Wayne No. 21AP0016, 2023-Ohio-2634, ¶ 7. This Court must view the evidence in a light most favorable to the State. *See Jenks* at paragraph two of the syllabus. Schultz has not argued that the State failed to prove any specific element of his convictions. Nor has he argued that the State failed to prove certain conduct occurred during each of the time periods alleged in his indictment. In analyzing the sufficiency of the evidence, we tailor our review to address the limited argument Schultz has presented on appeal.

{¶11} J.S. testified that Schultz began sexually abusing her when she was five years old. She described how he began touching himself in front of her before he progressed to rubbing her private parts. Schultz later penetrated her vagina with his finger and, when she was thirteen, had intercourse with her. J.S. remembered the abuse occurring primarily in her parents' bedroom at night while her mother slept elsewhere. She also recalled several instances of abuse in her own bedroom and one in the bathroom. J.S. testified that most of the abuse occurred while she was five, six, seven, and eight years old. It stopped after Schultz had intercourse with her at thirteen. J.S. recalled that, on one occasion, Schultz brought her and B.S. into a room together and made them both touch his penis.

{¶12} B.S. testified that Schultz began sexually abusing her when she was three years old and continued to abuse her after she turned four. She testified that Schultz would touch her vagina and she would experience pain when he did so. She also recalled an incident when he tried to put his penis in her mouth and another when he set her on his stomach and moved her body back and forth against him while wearing only his underwear. Much like J.S., B.S. described most of the abuse occurring in her parents' bedroom at night. She also remembered one incident when Schultz brought both her and J.S. into a room to abuse them.

{¶13} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved Schultz' guilt beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Both J.S. and B.S. described Schultz subjecting them to ongoing sexual abuse from an early age. "In sex offense cases, this Court has held that the testimony of the victim, if believed, is sufficient to support a conviction, even without further corroboration." (Internal citations and quotations omitted.) *State v. Rivera*, 9th Dist. Lorain No. 22CA011875, 2023-Ohio-1788, ¶ 22. The State produced adequate evidence to establish Schutlz' guilt through the testimony of J.S. and B.S. Because he has not shown that his convictions are based on insufficient evidence, we reject his argument to the contrary.

<u>Weight of the Evidence</u>

{¶14} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id.*

{¶15} Schultz argues his convictions are against the manifest weight of the evidence because J.S. and B.S. were not credible witnesses, inconsistencies plagued their testimony, and the evidence tended to show they fabricated the allegations against him. He notes that the girls were not entirely consistent in their accounts when they spoke with an interviewer at the child advocacy center, an employee at children's services, and the jury. According to Schultz, he could not have

abused the girls in the manner they described because other children were often present in his home, the stairs and floorboards in the home were old and loud, and someone would have heard him bringing one or more of the girls into his bedroom at night. He notes that both girls participated in therapeutic treatment as children, but neither ever told one of their counselors they were abused. Instead, J.S. accused Schultz of abuse around the same time she was experiencing behavioral problems and losing privileges due to punitive restrictions he and her stepmother put in place. Schultz claims the jury lost its way when it chose to believe J.S. and B.S.

{¶16} Mother testified that she met Schultz online when she lived in Arizona. She later moved to Ohio to begin a relationship with him and, after she became pregnant with J.S., began living with him. They moved to a three-story home in Cuyahoga Falls a few years later, by which point B.S. had already been born. Mother testified that the girls shared an upstairs bedroom next to the master bedroom. Although Schultz stayed in the master bedroom, Mother routinely slept on the couch downstairs because Schultz snored too loudly.

{¶17} Mother and Schultz ended their relationship when J.S. was about six years old and B.S. was about four years old. Mother then took the girls back to Arizona for five months. When they returned to Ohio, Mother lived with a friend, sought child support from Schultz, and agreed to a visitation schedule. According to Mother, B.S. never wanted to go visit him and J.S. had mixed feelings about visitation. She testified that J.S. always seemed to have a "very close" relationship with Schultz compared to the relationship he had with B.S. Mother continued to take J.S. and sometimes B.S. to visit Schultz until J.S. turned seven. When J.S. was seven, she told Mother that Schultz was touching her. According to Mother, B.S. made a similar statement around that same time. Although Mother was shocked by their disclosures, she did not contact the

authorities. Instead, she stopped sending the girls to visit Schultz. She testified that she regretted not having reported Schultz when J.S. and B.S. first disclosed his abuse.

{¶18} Mother testified that she ultimately allowed the girls to resume visitation with Schultz because he got married and she thought his new wife would protect the girls while they visited. J.S. eventually began staying with Schultz most of the time while B.S. continued to stay with Mother. At some point, Mother moved further away, and J.S. chose to live with Schultz. According to Mother, J.S. was a happy child in her youth but became withdrawn, depressed, and prone to behavioral issues as she lived with Schultz and became a teenager.

{¶19} Mother admitted the primary reason she used to refuse to sleep in bed with Schultz when they were a couple was that she was a light sleeper and he snored too loudly. She also admitted that the home they shared was an older one that would have made it easier to hear if someone had been walking around in the middle of the night. Nevertheless, Mother did not recall waking up at night, even when many children were present in the home. On some occasions, Mother testified, there would be up to seven children sleeping in the house because both she and Schultz had children from other relationships. She did not remember ever being awoken by a child for any reason or hearing a child use the bathroom at night.

{¶20} The friend who allowed Mother to live with her when Mother returned to Ohio from Arizona also testified for the State. She testified that she was in the kitchen one day when J.S. was seven, speaking to her about "stranger danger issues and things like that." According to the friend, J.S. shocked her by telling her, "daddy touches my pee pee." The friend testified that J.S. divulged additional details, including that Schultz had put her in his bed, had put his hand inside her pull-ups, and had sat her on his lap in the bathroom while they were both naked. The friend indicated J.S. was upset as she disclosed the abuse and worried about causing trouble for

Schultz. The friend told Mother about the disclosure but deferred to her rather than report the incident to the authorities herself. Much like Mother, the friend testified that she regretted not immediately reporting Schultz to the police when J.S. first disclosed the abuse.

{¶21} The State also introduced testimony from a woman whose daughter was friends with J.S. The woman testified that her daughter and J.S. were very close for many years and stayed in contact even after they stopped attending school together. When J.S. was fourteen, she and B.S. went to the woman's house to have a day trip with her and her children. The woman testified that J.S. and B.S. became upset and started telling her they did not want to go back to their father's house later that day. J.S. said she was afraid of her father because he touched her. J.S. also was afraid for B.S. because J.S. planned to leave the house with her stepmother later that day and worried Schultz would sexually abuse B.S. in her absence. According to the woman, the girls were crying, shaking, and took a significant amount of time to calm down once she reassured them they were safe. The woman testified that she took the girls to the police station later that same day to report the sexual assaults.

{¶22} As previously noted, both J.S. and B.S. testified that Schultz sexually abused them from an early age. B.S. could not recall many surrounding details from that period but was adamant that the abuse occurred. She testified that it was easy for her to remember the abuse because it was a traumatizing event that left a lasting impression. She was unable to estimate exactly how many times Schultz abused her but said that it occurred often. Although Mother was home when the abuse occurred, B.S. believed Mother never heard anything because she was sleeping downstairs at the time.

{¶23} J.S. described Schultz' abuse as "an on-and-off thing" that would "sometimes * * * slow down, and then * * * pick back up again." When she was younger, J.S. testified, the abuse

would occur at night while Mother was sleeping. When she was older, the abuse would occur when her stepmother was at work. J.S. admitted that she did not like the rules Schultz and her stepmother imposed when she lived with them. She admitted that she had posted several messages on social media wherein she called her stepmother a variety of names and complained about her home life but never claimed she was abused. Further, J.S. admitted that she had seen multiple counselors over the years but had never disclosed the sexual abuse to them. J.S. testified that Schultz instructed her never to tell anyone about the abuse because he would get into trouble.

{¶24} Dr. Robin Tener testified as a clinical psychologist and expert in child sexual abuse. She testified that, when a parent is an abuser, a child may find it exceedingly difficult to report the abuse because the child values the parental relationship and may simply be accustomed to the abuse. She indicated that delayed disclosures are very common and may occur due to an increase in the severity of the abuse or the child feeling he or she has no other choice but to disclose. According to Dr. Tener, if a child does disclose abuse to an adult and sees that nothing is done to address it, the child may be even more hesitant to come forward again in the future. She confirmed that anxiety, depression, and behavioral problems can all be signs of sexual abuse in children.

{¶25} Dr. Tener reviewed J.S. and B.S.' forensic interviews. She noted that the disclosure J.S. made when she was fourteen came shortly after Schultz had vaginal intercourse with her for the first time. She reiterated that an increase in severity of abuse can be a motivating factor for a child in his or her decision to disclose the abuse. Dr. Tener did not find it unusual that neither J.S., nor B.S. disclosed the abuse they experienced when meeting with counselors over the years. She testified that they each met with those counselors for distinct, unrelated issues, and it would be highly unusual and inappropriate for a counselor to prompt a child about sexual abuse due to inherent risks in suggestive questioning. Regarding inconsistencies in the interviews J.S. and B.S.

gave, Dr. Tener testified that it is not ideal for children to be interviewed multiple times regarding sexual abuse disclosures because they have difficulty giving precise accounts or explaining things the exact same way on each recounting.

{¶26} Schultz presented two witnesses on behalf of the defense: his wife and an expert in child abuse. The wife testified that she began a relationship with Schultz after he ended things with Mother. The wife worked as a pediatric nurse for many years and was well versed in matters of child abuse. She was adamant that she never detected anything that might lead her to believe Schultz was abusing his girls. She insisted that she would have known if J.S. was being abused and called her accusations a "very disgusting" and "outrageous lie[.]" Even so, the wife admitted she worked long shifts outside the home such that she would have been away from home for extended periods of time. She also admitted that J.S. engaged in self-destructive behavior, including cutting herself.

{¶27} Dr. William O'Donohue testified that he was the director of a clinic that treated sexually abused children. He also had a wealth of experience revising manuals and publishing articles about child abuse, pedophilia, and forensic interviewing techniques in children. He testified that children readily recall abuse and core details associated with abuse because abuse constitutes a traumatizing event. Consequently, Dr. O'Donohue testified, a child should be able to recount the core details of an event consistently, even when recounting those events on multiple occasions. Even so, Dr. O'Donohue admitted it would not be unusual for a child to struggle to recall peripheral or less central details surrounding a traumatic event. He also admitted that behavioral issues can be a predominant sign of sexual abuse in some children.

{¶28} Having reviewed the record, we cannot conclude that Schultz has shown his convictions are against the manifest weight of the evidence. The jury heard J.S. and B.S. describe

the long-term abuse they suffered at the hands of Schultz. Although the abuse was not reported to law enforcement for many years, the jury heard testimony that the girls tried disclosing the abuse when J.S. was seven. Both Mother and her friend admitted that they simply failed to report it. While Schultz took the position that the girls fabricated the allegations against him, the jury was in the best position to evaluate the credibility of the testifying witnesses. *See State v. Singer*, 9th Dist. Medina No. 22CA0039-M, 2023-Ohio-2636, ¶ 22. "[T]his Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge simply because the trial court chose to believe certain witnesses' testimony over the testimony of others." *State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 20, quoting *State v. Ross*, 9th Dist. Wayne No. 12CA0007, 2013-Ohio-522, ¶ 16. Schultz has not shown that this is the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by convicting him. *See Otten*, 33 Ohio App.3d at 340. As such, we reject his argument that his convictions are against the manifest weight of the evidence. Schultz' sole assignment of error is overruled.

III.

{¶29} Schultz' assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
STEVENSON, J.
CONCUR.

APPEARANCES:

NATHAN A. RAY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.