[Cite as *State v. Yost*, 2024-Ohio-545.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    30625 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ROBERT C. YOST | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 20 04 1040 |

## DECISION AND JOURNAL ENTRY

Dated: February 14, 2024

CARR, Presiding Judge.

**{¶1}** Defendant-Appellant Robert Yost appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** In April 2020, an indictment was filed charging Yost with four counts of rape in violation of R.C. 2907.02(A)(1)(b) and four counts of gross sexual imposition in violation of R.C. 2907.05(A)(4)/(C)(2). The charges involved Yost's minor step-granddaughter, E.D., who was born in 2013.

**{¶3}** Ultimately, the matter proceeded to a jury trial in January 2023. Yost was found guilty of the charges and sentenced to an aggregate term of life imprisonment with parole eligibility after 30 years.

**{¶4}** Yost has appealed, raising three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

MR. YOST'S FOUR RAPE CONVICTIONS IN VIOLATION OF R.C. 2907.02(A)(1)(B) WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} Yost argues in his first assignment of error that his convictions for rape were against the manifest weight of the evidence as the evidence did not support that Yost penetrated E.D.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id.*

{¶6} R.C. 2907.02(A)(1)(b) provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

> "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶7} This Court has held "that insertion, however slight, of a part of the body or other object within the vulva or labia is sufficient to prove vaginal penetration for purposes of proving sexual conduct as defined in R.C. 2907.01(A) and rape in violation of R.C. 2907.02." *State v.*

*Melendez*, 9th Dist. Lorain No. 08CA009477, 2009-Ohio-4425, ¶ 14. Moreover, "victim testimony related to penetration is sufficient to support a conviction for rape even where the victim's own testimony is conflicting on the issue." (Internal quotations and citations omitted.) *Id.* at ¶ 15. We are mindful that the jury is in the best position to evaluate credibility. *State v. Schultz*, 9th Dist. Summit No. 30407, 2023-Ohio-4228, ¶ 28. Moreover, the jury is "free to believe all, part, or none of the testimony of each witness." (Internal quotations and citations omitted.) *State v. Briggs*, 9th Dist. Medina Nos. 21CA0064-M, 21CA0065-M, 21CA0066-M, 21CA0067-M, 2023-Ohio-1931, ¶ 27.

{¶8} The evidence presented at trial can be summarized by the following narrative. A few years prior to E.D.'s disclosure of sexual abuse, E.D. lived with paternal grandmother ("Grandmother") and paternal step-grandfather, Yost. The grandparents gained temporary custody of E.D. and her sibling due to addiction issues being faced by E.D.'s mother ("Mother"). Mother also used drugs while she was pregnant with her youngest child. E.D. began experiencing night terrors around the time Grandmother and Yost got custody. However, Grandmother asserted that the night terrors resolved within six months of staying with them.

{¶9} Mother's drug addiction created some tension between Mother and Grandmother, although Mother maintained at trial that Grandmother was like a mother to her. Grandmother described their relationship a bit differently; Grandmother indicated that truthfulness was not Mother's strong suit and that Mother would sometimes get angry with Grandmother for not watching the children when Mother wanted Grandmother to do so. Grandmother also indicated that Mother had made false claims about one of Grandmother's sons molesting E.D. and that Mother also told someone that she was going to have E.D. accuse Yost of molesting E.D.

According to Grandmother, when Mother was confronted with that accusation, Mother indicated that she did not mean it.

{¶10} Prior to losing custody of the children, Mother, E.D.'s father, and the children frequently moved residences, only staying in each for a short period of time. Mother regained custody of the children in 2018 but Grandmother and Yost continued to have a relationship with E.D. and had frequent visitation with her. E.D. had a close relationship with both Grandmother and Yost. Grandmother testified that E.D. loved Yost and asked to spend time with him and have him put her to bed. Mother indicated that E.D. began having difficulties in school, particularly beginning in her kindergarten year.

{¶11} On March 26, 2020, when E.D. was seven years old, she went over to Grandmother's and Yost's home to stay for the weekend. During the night, E.D. came downstairs and told Grandmother that Yost touched her privates or "pee-pee." Grandmother did not remember anything about E.D. saying that Yost put his fingers inside E.D.; Grandmother expressed that she would have recalled that if it had been said. Grandmother asked E.D. if she was sure or if she had a bad dream. E.D. indicated that she was positive, and she did not have a bad dream. Grandmother went and confronted Yost. Yost denied the allegations saying that "that's crazy." E.D. told Yost that he was lying. Grandmother took E.D. into E.D.'s bedroom and slept in the room with her. Grandmother had Yost leave the house for a time but began living with him again in September 2020.

{¶12} On March 27, 2020, Grandmother took E.D. home and told Mother that E.D. had told her that Yost touched E.D.'s private parts. Mother called the Sheriff and took E.D. to the hospital emergency room. The emergency room medical records, which were admitted into evidence, indicate that E.D. informed the social worker that Yost's nails were sharp and they hurt

her.  E.D. also stated that Yost put spit on his finger and put it in her private.  E.D. reported that Yost had been touching her private since she was five years old.

{¶13}  Dr. Ramona Ester Lutes conducted a physical examination of E.D.  Dr. Lutes also collected vaginal and perianal samples from E.D.  Dr. Lutes explained that a swab is taken of the labia majora, or the outer lips.  A sample was then taken of the "internal space between the labia majora and labia minora which is a mucosal surface * * * and is an internal surface."  Dr. Lutes explained that, in prepubertal children, the vaginal opening itself is not swabbed as it is very sensitive.  Dr. Lutes also took a perianal swab from the area around the anus.  E.D.'s underwear was also collected at that time.  Dr. Lutes indicated that the social worker who spoke to E.D. prior to the exam stated that E.D. had alleged that Yost put his fingers in E.D.'s vagina and that he would spit on his fingers and then touch her.  E.D. reported that Yost frequently touched her private area and that the last time was at 1:00 a.m. overnight.  Dr. Lutes noted no physical injuries, which she stated was common.

{¶14}  Darla Helmick is a social worker who conducted a forensic interview of E.D. on April 1, 2020, at the CARE Center.  E.D. was referred to the CARE Center after her emergency room visit.  The interview was recorded, played for the jury, and admitted into evidence.

{¶15}  During the CARE Center interview, E.D. informed Ms. Helmick that Yost did something bad to her.  E.D. was in her room, pretending to be sleeping, and Yost came in, put spit on his finger, and put it in E.D.'s private.  E.D. stated that Yost moved his finger around in circles until it dried and kept scratching her.  E.D. indicated that Yost had sharp nails.  E.D. indicated that he rubbed his finger everywhere on her pee-pee, which E.D. stated she uses to go to the bathroom.  Ms. Helmick asked E.D. if Yost put his finger on the outside of her body or the inside of her body.  E.D. responded inside and then added that it was both.  E.D. stated that it hurt a little when Yost

did this. E.D. told Ms. Helmick that she waited until Yost finished because she was afraid. When he did, she went downstairs and told Grandmother. E.D. stated that Yost denied the allegations and E.D. told him he was lying. E.D. told Ms. Helmick that Yost had been touching her since she was four or five years old and that he did not do it every day. E.D. indicated that she did not tell Grandmother sooner because she was afraid, and she did not want Yost to have to leave because he was fun.

{¶16} E.D. was then examined by Dr. Paul McPherson, the medical director of the CARE Center, who also observed the interview with Ms. Helmick. Dr. McPherson conducted a head-to-toe exam of E.D. Dr. McPherson explained that nothing was inserted inside the vagina during the exam because, in prepubescent girls, the hymen is sensitive and touching it can cause pain or discomfort. Whereas, when the outside area, labia majora, is touched, it is not painful.

{¶17} Dr. McPherson's exam did not reveal any abnormal findings. He explained that that is the case in more than 90 percent of exams for sexual abuse and it did not negate E.D.'s disclosure of abuse. Dr. McPherson testified that there were two possible reasons E.D. experienced pain from what she described as being scratched by Yost: 1. It was possible Yost scratched her with a fingernail; or 2. E.D. experienced Yost touching E.D.'s hymen, which would have caused pain and discomfort. Dr. McPherson opinioned that the second explanation was "very likely."

{¶18} Mother informed Dr. McPherson that E.D. struggled in school, was becoming emotional at school, and was not completing work. E.D. began seeing a counselor and had been diagnosed with anxiety, depression, possible PTSD, attachment disorder, ADHD, and ODD. Dr. McPherson testified at trial that these behavioral issues are consistent with, but not diagnostic of child sexual abuse. Ms. Helmick also commented on E.D.'s mental health issues during her

testimony, noting that they could be caused by trauma, including sexual abuse or the problems associated with Mother's drug abuse. Near the end of his direct examination, Dr. McPherson stated that all of his testimony was given within a reasonable degree of medical certainty.

{¶19} Hallie Dreyer with Ohio Buruea of Criminal Investigation testified concerning the DNA results of the samples taken from E.D. Ms. Dreyer indicated no DNA profile foreign to E.D. in the vaginal and perianal swabs was detected using conventional DNA testing. Y-STR analysis was also performed which focuses on male DNA and ignores any female DNA. The vaginal sample from E.D. contained a Y-STR profile that was consistent with Yost, which meant that neither Yost nor any of his paternal male relatives could be eliminated as the source of the profile. The profile is not expected to occur more frequently than once in 9,773 male individuals in the U.S. population. Additionally, the sample taken from the front panel of the crotch of E.D.'s underwear revealed a mixture of male DNA using the Y-STR analysis. The major profile found was consistent with contributions from Yost, meaning neither he nor any of his paternal relatives could be excluded. Ms. Dreyer testified that the more contact there is with a surface the more opportunity there is for DNA transfer. She also emphasized that the testing she conducts cannot reveal how the DNA was deposited or when it was deposited.

{¶20} At the trial, which took place almost three years after E.D.'s disclosure, E.D. also testified. At the time of trial, E.D. was ten years old. E.D. testified to staying at Grandmother's and Yost's house on many occasions. E.D. indicated that when she was there that she would do science experiments, play in the woods, watch TV with Grandmother, and play a game with Yost. E.D. described her time there as some of the best times of her life.

{¶21} E.D. also testified that Yost would come into her room and touch her private, which she called her "pee-pee", under her underwear with his fingers. E.D. described Yost's fingers

going around and around her private and that it was sharp and hurt her when he did it. E.D. stated she would pretend to be asleep. She wanted to get up and tell him to stop but she was afraid. E.D. reported that it would happen "almost every day[.]" E.D. testified that the last time it happened was when she was just turning seven or was still six, but that it did not happen on the day that she told Grandmother about the abuse. She indicated that it happened when she was six and five years old as well. When E.D. was asked whether Yost's fingers were on her private, in her private, or somewhere else, E.D. asserted that his fingers were on her private. The prosecutor then asked E.D., "Are you telling us it never went inside you?" E.D. responded, "I'm not sure, maybe."

{¶22} Grandmother testified for the defense and indicated that Yost sometimes helped with the household laundry by taking clothes out of the dryer and folding them. Grandmother indicated that he did that a couple times a week, but she did laundry every day. Grandmother also reported that she was sexually abused as a young child and told E.D., on a fairly regular basis, that, if anybody touched her inappropriately, E.D. should tell Grandmother.

{¶23} In addition, Dr. William O'Donohue testified for the defense via Zoom. Dr. O'Donohue is a professor of clinical psychology and also codirects a clinic which provides free psychotherapy to victims of sexual abuse and children subjected to physical abuse. Dr. O'Donohue has published numerous articles and book, many of which concern child sexual abuse. He was qualified by the trial court as an expert in child abuse.

{¶24} Dr. O'Donohue testified that perpetrators tend to isolate their victims to avoid discovery and often threaten or bribe the victims to keep them quiet. He testified that children readily recall abuse and core details associated with abuse because abuse constitutes a traumatizing event. Consequently, Dr. O'Donohue testified, a child should be able to consistently recount core details. His research indicates that 97% of children were consistent in the description of the core

details of their abuse. Dr. O'Donohue indicated it would be uncommon for a victim to initially describe a penetrative sexual act and then later say there was no penetration. He explained it would also be uncommon for a child to initially say something happened that day and then later say it did not happen that day. Dr. O'Donohue also reported that children tend to remember the first and last instances of abuse very clearly. Dr. O'Donohue averred that numerous problems happen following abuse, including PTSD, anxiety, panic disorders, mood disorders, conduct disorders, difficulties in school and with relationships. Children also often become afraid of their abuser and do not want to spend time with that person.

{¶25} Dr. O'Donohue asserted that most sexual abuse allegations are true; however, there can be false allegations. Inter alia, false allegations can arise if children are presented with leading questions or repeatedly questioned about a subject. Dr. O'Donohue noted that this is also why forensic interviews utilize techniques to reduce the likelihood of false reporting. ODD, or oppositional defiant disorder, can also lead to false reports as children with it tend do things that they know are wrong. Dr. O'Donohue also opined that attachment disorders can lead to false reports of abuse because of the deterioration of important relationships associated with the disorder.

{¶26} After independently reviewing the entire record, we cannot say that Yost has demonstrated that his four convictions for rape are against the weight of the evidence. Despite Yost's argument to the contrary, there was substantial evidence presented that Yost digitally penetrated E.D.'s vagina. During her CARE Center interview, which was played for the jury and admitted into evidence, E.D. stated that Yost put his fingers both inside and on her private. In the interview, and during her testimony, E.D. explained that Yost spit on his finger and then rubbed it around her private and that it hurt some when he did that. She reported that Yost touched her

inappropriately on multiple occasions from the time she was five through when she was seven. While it is true that E.D. did not testify at trial to penetration, there was other evidence of penetration the jury could have found convincing including E.D.'s CARE Center interview, her reports in the emergency room to the social worker, as well as supportive evidence testified to by Dr. McPherson and Ms. Dreyer. Dr. McPherson opined that the pain she felt was very likely due to Yost touching E.D.'s hymen, an internal structure. Near the end of his direct examination, Dr. McPherson stated that all of his testimony was given within a reasonable degree of medical certainty. Dr. McPherson also noted that E.D.'s behavioral issues were consistent with childhood sexual abuse, but not diagnostic of it. Ms. Dreyer testified that the Y-STR analysis of the vaginal swab revealed a profile that was consistent with Yost, which meant that neither Yost nor any of his paternal male relatives could be eliminated as the source of the profile. While there is no way to know how the DNA was deposited there, the jury would not have been unreasonable to have found that it got there from inappropriate touching by Yost. The jury could have been unpersuaded that Yost's handling of the laundry explained the depositing of DNA in the vaginal sample from E.D. While there was expert testimony that certainly called into question some of the inconsistencies in E.D.'s statements, the jury was in the best position to evaluate the credibility of the witnesses and make credibility determinations. *See State v. Schultz*, 9th Dist. Summit No. 30407, 2023-Ohio-4228, ¶ 28. We will not overturn a jury verdict simply because the jury believed certain witness testimony over that of others. *Id.* Moreover, to the extent that E.D.'s testimony was inconsistent with some of her prior statements, it was the jury's role to take note of those points and resolve them or discount them. *State v. Ocasio*, 9th Dist. Lorain No. 15CA010773, 2016-Ohio-4686, ¶ 29. Yost has not demonstrated the jury lost its way in finding him guilty of rape.

**{¶27}** Yost's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO GRANT MR. YOST'S MOTION FOR MISTRIAL.

**{¶28}** Yost argues in his second assignment of error that the trial court abused its discretion in failing to grant Yost a mistrial.

**{¶29}** This Court generally will not reverse a trial court's decision pertaining to a motion for mistrial absent a demonstration that the trial court abused its discretion. *State v. Stevens*, 9th Dist. Summit No. 30336, 2023-Ohio-2153, ¶ 16.

**{¶30}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "To determine whether the alleged misconduct resulted in prejudice, a court must consider (1) the nature of the error, (2) whether an objection was made, (3) whether the trial court provided corrective instructions, and (4) the strength of the evidence against the defendant." (Internal quotations omitted.) *Stevens* at ¶ 18, quoting *State v. Edwards*, 9th Dist. Summit No. 28164, 2017-Ohio-7231, ¶ 13. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." (Internal quotations and citations omitted.) *Stevens* at ¶ 28.

**{¶31}** Here, during the cross-examination of Grandmother, Grandmother testified that Yost denied the allegations made by E.D. The State then asked Grandmother, "And you didn't trust him, did you?" At that point, defense counsel objected, and a side bar was held. Defense counsel argued that it was improper for a witness to comment on the credibility of another witness and the question improperly implied that Grandmother did not trust Yost, thereby also implying that Yost committed the offense. Defense counsel then moved for a mistrial. The trial court denied the motion. The trial court then informed the jury that the State was withdrawing the question and

ordered the jury to "disregard the question as if [it] did not hear it[.]" The jury was also later instructed that any testimony that it was instructed to disregard must be treated as though the jury did not hear it and the jury could not "consider as evidence any suggestion included in a question that was not answered."

**{¶32}** Yost has not demonstrated that the trial court abused its discretion in denying the motion for a mistrial. Even assuming the question was improper, the jury did not hear an answer to the question. Moreover, the jury came to learn that Grandmother made Yost leave the house for a time and Grandmother took the accusations seriously enough to inform Mother so that E.D. could get the appropriate care and the allegations could be investigated. Thus, the jury may have reasonably inferred that Grandmother, at least initially, did not completely trust what Yost said. Additionally, the trial court provided the jury with an instruction to disregard the question, which the jury is assumed to have followed. *See id.* Further, we are mindful that there was substantial evidence that Yost committed the crimes at issue and the question did not directly address that issue.

**{¶33}** Yost's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED THE
STATE TO REPEATEDLY QUESTION E.D. ON PENETRATION.

**{¶34}** Yost argues in his third assignment of error that the trial court abused its discretion in allowing the State to repeatedly ask E.D. about penetration.

**{¶35}** Evid.R. 611(A) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Evid.R. 611(C). Thus, a trial court possesses broad discretion in these areas. *See State v. Williams*, 9th Dist. Summit No. 29547, 2021-Ohio-2491, ¶ 21; *State v. Liddle*, 9th Dist. Summit No. 23287, 2007-Ohio-1820, ¶ 30.

> Ohio case law has explained that the trial court is to be given latitude in such matters, especially in cases involving children who are the alleged victims of sexual offenses. This Court has recognized that the necessity to use leading questions to develop testimony may be more critical where the witness is a child who may be uncomfortable, fearful or perplexed by the legal system. Leading questions are often permitted in order to pinpoint specific details and times. Such testimony may not be a ground for reversal on review unless prejudice results.

(Internal citations omitted.) *Liddle* at ¶ 30.

{¶36} Here, when questioning E.D. on direct examination, the State first asked if, "[w]hen [Yost] would come in your room and touch you with his finger, was his finger on your pee-pee, in your pee-pee * * * or somewhere else?" Defense counsel objected on the basis of leading, and the trial court overruled the objection. E.D. answered, "On." The State then asked, "Did it ever go inside?" Defense counsel again objected, this time on the basis that it was asked and answered. The trial court sustained the objection. The State next asked, "Are you telling us it never went inside you?" Defense counsel objected, asserting that it had been asked and answered. The trial court overruled the objection. E.D. then responded, "I'm not sure, maybe."

{¶37} Despite Yost's argument to the contrary, we cannot say that Yost has demonstrated that the trial court abused its discretion in allowing the State to ask the question it did. This question could be viewed as the State attempting to clarify E.D.'s answer and ensure that it had a correct understanding of E.D.'s allegations. *See State v. Rector*, 7th Dist. Carroll No. 01 AP 758, 2002-Ohio-7442, ¶ 31-32.

{¶38} Furthermore, we cannot say that Yost has shown that E.D.'s answer prejudiced him. E.D.'s answer was unclear. The answer initially expressed uncertainty and was followed with "maybe[,]" which in light of the way the question was asked, could be viewed as E.D. confirming that Yost's fingers did not go inside her. Either way, Yost has not demonstrated that this answer was outcome determinative to the case; as discussed above, there was additional substantial evidence presented to support that Yost committed the crimes at issue.

{¶39} Yost's third assignment of error is overruled.

## III.

{¶40} Yost's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

PETER T. CAHOON and BRANDON W. MCHUGH, Attorneys at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.